UNITED STATES of America,
Plaintiff–Appellee,

v.

Tonnie J. TOLLIVER and Ray D.
Love, Defendants–Appellants.

Nos. 90–2842, 90–2915.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1991.

Decided July 16, 1991.

Mel S. Johnson, Asst. U.S. Atty., Susan M. Knepel, Milwaukee, Wis., for U.S.

Andrew Mishlove, Milwaukee, Wis., for Tonnie J. Tolliver.

Thomas G. Halloran, Milwaukee, Wis., for Ray D. Love.

Before BAUER, Chief Judge, COFFEY, Circuit Judge, and WILL, Senior District Judge.*

BAUER, Chief Judge.

In early 1990, Frederick "Billy" Schneider was arrested for cocaine trafficking. In exchange for Schneider's cooperation in identifying other cocaine traffickers in the Milwaukee, Wisconsin, area, the government did not seek an indictment against him. Schneider agreed to pose as a middleman in a "sting" operation in which an FBI agent would pose as a cocaine dealer from Michigan who was interested in selling the drug in Milwaukee. It was up to Schneider to arrange a cocaine transaction between the agent, Richard Dye, and prospective buyers and distributors. Special Agent Dye provided Schneider with $3500 of government money to buy a sample from his drug sources in Detroit. Schneider went to Detroit all right, but he spent the money on hotels, cocaine for personal use, and prostitutes. (Such conduct undermines the faith of government agents in humankind. Ah, well!) Upon his return from Detroit, Schneider was arrested at the Milwaukee airport. Now facing federal charges, Schneider agreed to cooperate just a little bit more.

Schneider previously had purchased cocaine from Tonnie Tolliver. In his new role as FBI informer, Schneider contacted Tolliver to arrange a drug deal with Dye. Throughout the first week of March (all these events occurred in 1990), Schneider, Tolliver, and Dye stayed in touch through paging devices and cellular phones. They had numerous conversations (that, unbeknownst to Tolliver, were recorded) regarding the amount of cocaine to be bought and sold, the price, and the manner in which any deal was to go down. Tolliver agreed to purchase one kilogram of cocaine for $18,000 and an additional half kilo for $9,000. As part of the agreement, Tolliver and Dye arranged for Tolliver to take a look at a sample of the cocaine for sale.

* The Hon. Hubert L. Will, Senior Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

On March 5th, Dye drove a rental car to the Marriott Residence Inn in Glendale, a Milwaukee suburb. There were 523 grams of cocaine in plastic bags in the trunk. Dye registered and left his car in the parking lot in a position where it could be viewed from his hotel room. Schneider and Tolliver soon arrived together and Schneider met with Dye to obtain keys to the rental car. Schneider then returned to the parking lot, where he and Tolliver parked near Dye's car. Dye and other surveillance officers observed them remove some of the cocaine from the trunk of Dye's car and place it into a cigar tube Tolliver had with him. After a few minutes, they closed the trunk. Schneider returned the keys to Dye and he and Tolliver left the parking lot area. It later was determined that Schneider and Tolliver had removed approximately 35 grams of cocaine from the trunk of Dye's car.

Tolliver evidently liked the sample. Over the telephone, he arranged a one kilogram transaction with Dye for the next day, March 6th. Schneider was to serve as go-between. Schneider must have liked Dye's sample, too, because he was too high to show up on March 6th. Consequently, the deal had to be rescheduled for March 7th. The plan was as follows: Dye and Schneider were to drive to Tolliver's house. Once Schneider confirmed that Tolliver indeed had the $18,000, he was to bring the cocaine into the house and return to Dye's car with the cash.

On the appointed day, everything was in place. FBI agents surrounded the Tolliver residence and Schneider entered at approximately 9:30 am. There was, unfortunately, a hitch. Tolliver told Schneider that the people with the money were on their way and that they would soon be there. Tolliver instructed Schneider to telephone him later to confirm that the money had arrived. At around 9:50 am, the surveillance team saw a copper-colored Cadillac circle Tolliver's block for six or seven minutes. Eventually, it stopped in the alley behind Tolliver's house. Two men got out and went into the house. The driver then parked the car on the street in front of the house and remained in the vehicle. After a few minutes, the driver got out of the car and he, too, went into Tolliver's. He was wearing a distinctive white leather hat and was carrying a brown plastic bag.

Schneider, who was driving around with Dye, telephoned Tolliver and was told that the money had arrived. Dye and Schneider returned to Tolliver's. When Schneider entered the house, he saw four men: Tonnie Tolliver, Vincent M. Williamson, Ray Love, and Larry Love. Schneider also saw guns and, sitting on a table, a large amount of cash. Tolliver was next to the table and Williamson was counting the money. According to Schneider's trial testimony, the individual in the white leather hat was standing near the table. He told Schneider that he had more money if it were needed and demonstrated as much by pulling out a large wad of bills from his pocket. Sometime later, Schneider learned that this man was Ray Love.

Schneider left the house to confer with Dye. Dye relayed Schneider's observations to the other agents and they decided that the whole scene was too risky. Consequently, Dye and Schneider phoned Tolliver to tell him that all bets were off. At around 11:00 am, the surveillance agents observed four men come out of Tolliver's and get into the Cadillac. The man with the white leather hat sat in the driver's seat. This time, he held a white plastic bag. The FBI closed in and pinched all four suspects.

At the time of the arrest, Ray Love was carrying $5,000 in cash in his socks and pockets and a loaded FIE .22 caliber revolver. A white plastic bag with an additional $18,020 in cash was found on the front seat of the car. Tolliver was carrying a plastic bag containing white powder (later determined to be approximately four grams of cocaine). On the floor of the rear seat of the Cadillac was a revolver case in a brown, plastic bag and a loaded Colt Python .357 revolver. The agents later discovered under the front seat an Ameritech pager invoice addressed to Ray D. Love. A search of the Tolliver residence revealed scales and sifters with powdery white residue, gun clips, ammunition, a plastic bag

with residue, a cellular phone, and an address book with an entry for Ray Love's beeper number.

Tolliver, Ray Love, and Williamson were indicted for drug trafficking, but Larry Love was not charged. On March 7, 1990, Tolliver appeared before a federal magistrate and requested and received appointed counsel. Tolliver wound up having a rather stormy relationship with his lawyer, Jeffrey Krebs. Tolliver took issue with Krebs' representation and even filed a complaint against him with the Wisconsin attorney disciplinary board. On April 25th, Tolliver filed a *pro se* motion for substitution of counsel and a hearing was held. At the hearing, Tolliver alleged that Krebs had failed to challenge the legality of the arrest and the seizure of evidence and that he failed to investigate the legality of the array of the grand jury. On the same day, Tolliver stated that he wished to proceed to trial *pro se*. The motion for substitution of counsel was denied but the motion to proceed *pro se* was granted. The court ordered Krebs to be present throughout the trial as standby counsel. Krebs later tried to withdraw several times, but the court requested that he remain until it could find a substitute. The court and its staff contacted twenty-nine attorneys, but none would take over Tolliver's defense.

On May 2nd, Tolliver filed an affidavit with the court exculpating Love. If the defendants were tried together and Tolliver, as was his right, refused to take the stand, then he would be unavailable as a witness for his codefendant. Consequently, Love's attorney immediately alerted the court to a possible need for severance. On May 23rd, the court held a final pretrial conference. At that time, severance again was discussed. Both defendants informed the court that Tolliver would be taking the stand in his own behalf, so the court saw no need to grant the motion for severance.

The trial began on May 29th. About midway in the proceedings, after the jury had been impaneled, after opening statements, and after the government's first witness had testified, Tolliver informed the court that he was "incompetent" to act as his own counsel and requested brand new appointed counsel. The court suggested that Krebs could take over, but the government objected on the grounds that, in view of the ethics complaint, Krebs should not be required to represent Tolliver. The essence of the government's argument was that Tolliver had made his bed (by wanting to go it alone) and now he had to lie in it. The court agreed, and advised Tolliver that it would make further attempts to locate new counsel but, in the meantime, he had to continue *pro se*.

Tolliver's performance lent credence to the old adage, "The man who serves as his own lawyer has a fool for a client." His theory of the case was that the "sting" operation was a ruse by Schneider to bilk the government out of cocaine for personal consumption rather than for distribution. Tolliver requested no theory of defense jury instruction, made no closing argument, and called no witnesses.

At the midway point of the proceedings, Love asked again that his trial be severed on the ground that Tolliver could provide exculpatory testimony for Love but was unwilling to testify in a joint trial. Love argued that, unless a severance was granted, he would be denied the right of confrontation. The government responded that the motion was premature because it was difficult to tell, based upon the many documents Tolliver had filed regarding his lawyer problems, whether or not he would be testifying. Tolliver cleared up the matter nicely by stating that he would not take the stand regardless of whether the defendants had joint or separate trials. Trial Transcript at 568, 577. The court denied the motion for severance on the grounds that there was no assurance that Tolliver would testify after a severance, and that it was questionable just how exculpating his testimony would be, assuming he changed his mind again and was available to testify.

And so Love and Tolliver were tried together and Tolliver muddled through his own defense. The jury found both defendants guilty of conspiracy to possess with intent to distribute in excess of 500 grams of cocaine in violation of 21 U.S.C.

§§ 841(a)(1) and 846. In addition, Love was found guilty of carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) and (2). Tolliver was sentenced to a four-year prison term. Love received a sentence of 123 months. In this appeal, both challenge several aspects of their convictions.

We begin with Tolliver. Not surprisingly, he argues that the district court abused its discretion in denying his mid-trial request for appointed counsel, thus forcing him to proceed with his own defense. He submits that a more appropriate course of action would have been for the court to adjourn the trial for several days so new counsel could be obtained.

■■■ The constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. *See Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1962). At the same time, a criminal defendant has a constitutional right to defend himself as long as he has "knowingly and intelligently" relinquished the benefits associated with the right to counsel. *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1974). The problem is, savvy criminal defendants have learned to manipulate the system by withdrawing requests for self-representation at the eleventh hour (or, as here, in midstream) in order to cause delay. Trial courts are thus faced with a dilemma. On one hand, "a trial judge is hard-pressed to deny the aid of counsel to a defendant who initially seeks to represent himself but later declares himself legally incompetent to proceed any further," *Horton v. Dugger*, 895 F.2d 714, 716 (11th Cir.1990); and on the other hand, "the last minute grant of a continuance can cause serious inconvenience to judge, jury, opposing counsel, witnesses, and other litigants." *United States v. Fountain*, 768 F.2d 790, 794 (7th Cir.1985), *cert. denied*, 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986). When a trial court does deny a request for a continuance, the decision rarely is overturned on appeal. *Morris v. Slappy*, 461 U.S. 1, 11,

103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983); *United States v. Solina*, 733 F.2d 1208, 1211 (7th Cir.), *cert. denied*, 469 U.S. 1039, 105 S.Ct. 519, 83 L.Ed.2d 408 (1984). It is well within the discretion of the court to deny as untimely requests for counsel made after meaningful trial proceedings have begun. *See, e.g. Horton*, 895 F.2d at 717 (citing cases).

■■ This is not the first time we have visited this problem. In *Solina*, the defendant made clear at his arraignment that he wanted to proceed *pro se*. As was the case with Tolliver, standby counsel was appointed. On the first day of the trial, Solina informed the court that he wanted the standby to take over the defense. The standby was not prepared and requested a continuance. The trial court denied the request and, on appeal, we upheld its decision:

A criminal defendant has a constitutional right to defend himself; and with rights come responsibilities. If at the last minute he gets cold feet and wants a lawyer to defend him he runs the risk that the judge will hold him to his original decision in order to avoid the disruption of the court's schedule that a continuance granted on the very day the trial is scheduled to begin is bound to cause.

*Solina*, 733 F.2d at 1211–12. In the case of Tolliver, several weeks before trial, a federal magistrate conducted a hearing pursuant to Tolliver's request to proceed *pro se*. The magistrate found that Tolliver knowingly and intelligently relinquished the right to counsel. In addition, at the final pretrial conference on May 23rd, the district court inquired into Tolliver's desire to represent himself. The court similarly came to the conclusion that the decision had been made knowingly and intelligently. The jury was empaneled, opening statements were made, and the first witness was examined. Only then did Tolliver yell that he was in over his head and needed help.

Tolliver insists that any difficulties the court may have encountered as a result of a continuance pale in comparison to his absolute right to have a new attorney ap-

pointed midway through the trial. He finds support for this notion in the following statement from *Horton:* "The functional right of a defendant to withdraw his request to represent himself and assert the right to counsel at any time immediately before, or perhaps even during the trial, is, absent deliberate manipulation, virtually assured." 895 F.2d at 716. Tolliver contends that, in order to deny a defendant's reasserted right to counsel, the trial court *must* make a finding of deliberate manipulation. Because the district court declined to make such a finding, Tolliver argues that a continuance was in order to give the court an opportunity to find him a new lawyer.

Not so. In nearly all the cases we have examined, it was the *timing* of the defendant's request that prompted the refusal to grant a continuance. In *Horton,* the basket in which Tolliver places most of his eggs, the request came fifteen minutes before the trial was set to begin. Here, Tolliver waited until the marching band was around the corner before deciding to join the parade. At that stage of the proceedings, a continuance would have caused a substantial disruption of the trial.

Also, there was no way of knowing how long the hiatus would have been or whether the court's efforts to locate new counsel would have been successful. Krebs probably was out of the picture. Earlier that day, Tolliver had served Krebs with a subpoena to testify at trial. The court responded that "It would be impermissible for this Court to permit Mr. Krebs to be called as a witness in what appears to be an adversarial role to his client, and still represent to the jury that he is defending Mr. Tolliver." Trial Transcript at 390. In light of this statement, it is unlikely that the court would have directed Krebs to step in. Other candidates were doubtful as well. The court previously contacted twenty-nine attorneys, all of whom declined to represent Tolliver. Even if the court had found new counsel, an additional continuance would have been required so that the new attorney could become familiar with the facts of the case.

Contrary to Tolliver's assertions, these are not minor considerations. In contemplating whether to grant a motion for a continuance, a trial court is entitled to factor in the public interest in proceeding on schedule. We have stated that "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *United States v. Hamm,* 786 F.2d 804, 806 (7th Cir.1986) (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)). In light of the circumstances, the district court's decision was neither "unreasoning" nor "arbitrary." Tolliver knowingly and intelligently waived his right to counsel; therefore, the district court did not abuse its discretion when it did not order a continuance in order to appoint new counsel.

Love has a go at it as well. During trial, he moved for a severance based upon the affidavit that had been filed by Tolliver before trial. The affidavit stated that there had been no discussion or agreement between Love and Tolliver that Love would give Tolliver drug money, that Love never gave Tolliver any money for the drug purchase, and that Love never had discussed cocaine purchases with Schneider and Tolliver. The affidavit further stated that Love went to Tolliver's on the day of the arrest so that Tolliver could accompany Love to do some legal business. Love argues that the district court abused its discretion in denying his request for a separate trial so that he could secure this exculpatory testimony from Tonnie Tolliver.

In making this argument, Love neglects one important detail. Tolliver was adamant: he was not going to testify even if the cases were severed:

TOLLIVER: No, in the case of, the statement I made was I would not testify in case of a severance or if not, without or with the severance.

COURT: Say it again?

TOLLIVER: I am not going to testify whether we are tried together or we

are not tried together, that is what I said.

Trial Transcript at 568.

■ When a defendant seeks a severance to avail himself of allegedly exculpatory testimony from a codefendant, a trial court must consider three factors: "(1) whether the co-defendant's testimony would be exculpatory; (2) *whether the codefendant would in fact testify;* and (3) whether the testimony would bear on defendant's case." *United States v. Melton,* 689 F.2d 679, 686 (7th Cir.1982) (citations omitted) (emphasis provided). *See also United States v. Gonzalez,* 933 F.2d 417, 425 (7th Cir.1991). Perhaps referring to Tolliver's about-face on representation, Love argues that the court should have granted the severance anyway because of Tolliver's "established history of changing his mind." Love Brief at 13. Speculation just does not cut it. "Severance cannot be granted on the basis of a vague, unsupported assertion that a codefendant would testify favorably in a separate proceeding." *United States v. Andrus,* 775 F.2d 825, 847 (7th Cir.1985). *See also United States v. Kord,* 836 F.2d 368, 373 (7th Cir.) ("The mere possibility of a co-defendant's testimony is insufficient grounds for a severance."), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988).

Love heavily relies upon our decision in *United States v. Echeles,* 352 F.2d 892 (7th Cir.1965), but his reliance is misplaced. In *Echeles,* we stated that the defendant should not be foreclosed of the possibility that the witness would testify on his behalf merely because that eventuality was not a certainty. *Id.* at 898. *Echeles,* however, readily is distinguishable, because in that case "it seemed more likely than not" that the witness would have testified on behalf of the defendant because he previously had done so three times in open court contrary to his own penal interest. *Id.* Here, Tolliver positively stated that he would not testify under *any* circumstances.

Motions for severance are committed to the sound discretion of the trial court and will be overturned only upon a showing of abuse of discretion. *Gonzalez,* 933 F.2d at 424–25. *See also* Fed.R.Crim.P. 14. The denial of Love's motion for severance did not deprive Love of a fair trial. He did not have Tolliver's testimony, true enough. But he would not have had it at a separate trial either.

■ Together, Tolliver and Love make one last challenge. They argue that the district court erred in denying their separate motions for acquittal on the grounds that the evidence was insufficient to warrant their convictions. We repeatedly have stated that defendants who attack the sufficiency of the evidence face an uphill battle. *See, e.g. United States v. Ruiz,* 932 F.2d 1174, 1178 (7th Cir.1991); *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986). In this case, Tolliver and Love don't make it out of the foothills. Both were convicted of conspiracy to possess cocaine with the intent to distribute. The recorded telephone conversations between Tolliver and Dye clearly reveal that Tolliver was working with others who were to provide money for the drug deal. In a March 4th conversation discussing kilograms of cocaine, Tolliver was heard to say, "they'll probably do three." Later, in reference to what would be the Marriott parking lot sample, he stated that he needed "a little something to show." The entire conversation was sprinkled with references to Tolliver's "people." Dye and Tolliver also discussed Tolliver's "people with the money." When Tolliver left the Marriott parking lot with Schneider and the sample, he was heard to say that he was going to show it to the potential buyers. Also on March 4th, Dye and Tolliver had another telephone conversation in which they set up the $18,000 deal for March 6th. Throughout the day, they telephoned back and forth to firm up details. In those conversations, Tolliver kept referring to his "folks" and his "guy" not being ready with the money for the transaction. In the next conversation on March 6, Tolliver told Dye that he had talked to his "guy" and discussed the fact that one of his people had been talking to a potential customer who had placed an order elsewhere.

When Schneider went to Tolliver's for the March 7th transaction, Tolliver made it clear that he was waiting for someone to show up with the money. Had Tolliver been working alone, he would have had the money himself and could have consummated the deal on the spot. Instead, he sent Schneider away (armed with a cellular phone) and instructed him to call back later to confirm that the money had arrived. And arrive it did. The men in the copper-colored Cadillac circled the block, parked in the alley behind Tolliver's residence, and went in. Love, the driver of the car, sat for several minutes and then moved the car to the front of the house. Love again stayed in the car for several minutes before proceeding to Tolliver's. He was carrying a brown plastic bag. Shortly after Love entered the house with the bag, Tolliver informed Schneider that the money had arrived. When Schneider returned to Tolliver's, he saw Love, Williamson, and Tolliver in the living room with a pile of cash. Love suggested that he had more on him if it were needed.

After the deal was called off because of Schneider's cocaine excesses, Love was spotted carrying a white plastic bag back to the Cadillac. When the car was inventoried, the agents found a white plastic bag on the front seat containing $18,020, twenty dollars more than the agreed purchase price of the cocaine. (The jury chose to disbelieve the testimony of Love's mother that the money belonged to her and that it was earmarked to purchase a house.) Love had another $5,000 on his person. The search also revealed loaded weapons and paging devices, commonly used by drug traffickers to keep in touch with their constantly moving suppliers and customers. Based on this evidence, a rational juror could have found beyond a reasonable doubt that Tolliver and Love were coconspirators in an attempt to obtain cocaine with the intent to distribute it.

■ Love also was convicted under 18 U.S.C. § 924(c), which provides an additional five-year prison term for "[w]hoever, during and in relation to any crime or violence or drug trafficking crime ... uses or carries a firearm...." Love contends that, even though he was caught with a loaded model T18 .22 caliber FIE revolver in his jacket pocket when he came out of Tolliver's after the aborted drug deal, the evidence was insufficient to prove that he carried a firearm during and in relation to a drug crime. First, he argues that there was no nexus between the gun and the crime. Second, he claims that he did not "use" the gun for purposes of section 924(c). Love's argument to the contrary, the evidence established a clear nexus between the crime charged and Love's possession of the firearm. The fact that he never brandished, fired, or referred to the gun during the drug transaction is immaterial. In *United States v. Rosado*, 866 F.2d 967 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989), we indicated that the fact that a defendant does not wave a gun around or fire it during an intended drug transaction does not mean that he did not "use" it:

> If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred, then there is a violation of the statute.

*Id.* at 970 (quotation omitted). A trier of fact reasonably could have concluded that Love armed himself with the .22 to insure the success of the drug transaction and to offer him protection while he carried over $23,000 in cash to pay for the drugs. Unquestionably, Love both "used" and "carried" a firearm in violation of 18 U.S.C. § 924(c).

The district court did not abuse its discretion in denying Tolliver's motion for a continuance and Love's motion for severance. Moreover, the evidence was sufficient to sustain the convictions of both defendants on all counts. Thus, for the foregoing rea-

sons, the convictions of Tonnie Tolliver and
Ray Love are

AFFIRMED.