UNITED STATES of America,
Plaintiff–Appellee,

v.

Mark D. GOAD, Defendant–Appellant.

No. 93–2108.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 20, 1994.

Decided Jan. 9, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 2, 1995.

Before CUMMINGS, FERGUSON,* and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Mark David Goad was convicted of bank fraud on December 20, 1990, and sentenced to thirty months of incarceration to be followed by three years of supervised release. On April 1, 1993 he was charged with committing several burglaries and transporting and selling stolen property, all violations of the terms of his supervised release. At a hearing on April 22, 1993, the district court determined that Goad had violated his supervised release and imposed a term of confinement of twenty-four months. Goad raises four arguments on appeal: (1) that the district court applied an incorrect standard of proof in revoking his supervised release; (2) that the district court violated his Fifth Amendment privilege against self-incrimination in finding that Goad associated with a known felon; (3) that the district court violated his Sixth Amendment right to counsel by allowing him to proceed *pro se* without adequate inquiry into his ability to defend himself, and, in the alternative, that his waiver of his right to counsel was neither knowing nor intelligent; and (4) that the district court erred in denying his motion to substitute appointed counsel. We affirm.

## I. FACTS

On November 20, 1990, Goad pled guilty to bank fraud and conspiracy in violation of 18 U.S.C. §§ 2 and 1344. Goad served his thirty-month prison term at Sandstone Federal Penitentiary in Minnesota. His three-year term of supervised release commenced on March 25, 1992. One year later, on March 30, 1993, Goad's probation officer, Janine Frank, filed a petition requesting the revocation of Goad's supervised release. Frank's petition alleged that the Dane County Sheriff's Office suspected that Goad had committed a number of burglaries in Madison, Wisconsin and the surrounding communities.[1]

John W. Vaudreuil (argued), Grant C. Johnson, Asst. U.S. Attys., Madison, WI, for U.S.

Allen E. Shoenberger, Katherine C. Walsh (argued), Chicago, IL, for defendant-appellant.

---

* Honorable Warren J. Ferguson, of the Ninth Circuit, is sitting by designation.

1. Detectives from the Dane County Sheriff's Department and the City of Madison Police Department both suspected that Goad had committed twelve to sixteen home burglaries using the same methods he had used to commit home burglaries in 1983. The perpetrator of each of the 1993

Frank alleged that Goad violated three separate conditions of the terms of his supervised release, specifically: (1) he committed a burglary in Maple Bluff, Wisconsin; (2) he traveled outside the jurisdiction without permission of the court; and (3) he associated with a convicted felon without permission from the probation office. The petition also requested the appointment of David Stokes, who had represented Goad in his 1990 bank fraud trial, as Goad's attorney.

The defendant was arrested on March 31, 1993, and charged with violating the terms of his supervised release. At the time of arrest he was wearing a black coat stained with insulating foam, and had in his possession a can of spray-foam insulation,[2] false identification cards and a jeweler's eye.

The district court held a probable cause bail hearing on April 1, 1993. At the beginning of the hearing, Stokes advised the court that he discussed the revocation petition and the attached Sheriff's Report with Goad prior to the hearing:

> THE COURT: Okay. Mr. Stokes, have you had an opportunity, however brief, to discuss the nature of the petition for revocation with your client?
>
> MR. STOKES: Briefly, yes, Your Honor.

Officer Frank testified concerning the items seized from Goad at the time of his arrest. Frank also informed the court that she had interviewed Goad's mother who stated that Thomas King (a convicted felon on supervised release) had stayed at her house with Goad "for three nights in her basement with Mark's knowledge." The defendant was present throughout this hearing, and argued to the court at the end of it that he should be released on bail. The defendant acknowledged that in response to a call from Officer Frank, he stated:

> I knew from between the words that were being said that I was, in fact, facing being placed in jail and so forth. . . . [B]efore

whatever happens happens, I'd like to have this—a moment to get my life organized outside with Social Services and so forth. . . .

The district court found cause to hold Goad for violation of the terms of his supervised release.

On the day scheduled for Goad's revocation hearing, Goad made a motion for the substitution of his appointed counsel. The court, after questioning Goad, found that the motion was based on his misinterpretation of the Sentencing Guidelines, and not on any failure of communication with his appointed attorney. The court informed Goad of the applicable sentencing range he faced for the violations of the terms of his release. Goad stated that his attorney had failed to inform him of what evidence the government intended to present against him and asserted that "[t]he whole time I've never known the implications of the guidelines." Goad's attorney disagreed and stated to the court, "Your Honor, I have to specifically disagree with that. I've been provided with the materials from the U.S. Attorney's Office that are—in this case." The court asked the Assistant United States Attorney, Grant Johnson, if he had turned over the sheriff's report to the defense. Johnson replied that the defense was given a copy of the revocation petition, which contained the sheriff's report detailing Goad's violations of the terms of his supervised release. The court denied Goad's request for new counsel. Goad then asked for permission to proceed *pro se*. The court acknowledged that Goad had the right to represent himself, but cautioned that if Goad were to proceed without counsel, the court would appoint Stokes as standby counsel. Goad consented and his hearing was adjourned until April 22, 1993.

On the rescheduled hearing date, the district court again apprised Goad of the nature

---

burglaries had cut the telephone lines to the house, silenced the security system alarm bell with spray insulation foam, and cut the wires of the control box inside the home. The police suspected Goad because the burglaries were unlike any in the area for over ten years and were similar to burglaries Goad committed in 1983. Moreover, two of the houses burglarized in 1993 were the same houses Goad had targeted in 1983.

2. The stains on Goad's coat and the can of foam insulation matched the substance used to disable the security system alarms in the burglarized homes.

of the charges against him, and again advised him of the possible period of confinement he faced. Goad renewed his request for substitution of counsel.[3] The court denied his request. Before allowing Goad to begin his defense, the district court repeated its order permitting Goad to represent himself with Stokes acting as standby counsel:

> THE COURT: Mr. Stokes will then be appointed as standby counsel for the availability to answer those legal questions which you believe are concerns which you wish to discuss. Is that your understanding?
>
> GOAD: Yes, sir.
>
> THE COURT: Are you then prepared to represent yourself in this matter?
>
> GOAD: Yes, I am sir.

The government presented two witnesses against Goad, Probation Officer Janine Frank, and Detective Thomas Kretschman of the Dane County Sheriff's Department. Frank testified from the sheriff's report and recounted the items found in Goad's possession at the time of his arrest. Goad declined to cross-examine Frank, stating he was "unprepared" even though shortly before, when questioned by the court, he asserted he was prepared to defend himself.

Detective Kretschman testified that he investigated a burglary that occurred on January 24, 1993 at a home in Maple Bluff, a suburb of Madison, Wisconsin. Kretschman explained that the burglar who invaded the Maple Bluff home had a *modus operandi* similar to that of the burglar responsible for other break-ins in the Madison, Maple Bluff, and Middleton areas. Receipts from local pawn shops listed a felon named Thomas King as the seller of silverware and jewelry reported missing after one of the local burglaries. When interviewed, King told the police that he was incarcerated at the federal prison in Sandstone, Minnesota with Goad. There, King explained, Goad had bragged about his burglaries. King further stated that he was a guest at Goad's mother's house from March 2, 1993 to March 5, 1993, and that he had taken silver and jewelry which Goad had stolen in earlier burglaries from

the basement of that house. King offered his cooperation to the authorities; the police agreed to help ensure that King would not be incarcerated at the same prison with Goad.

Detective Kretschman testified that King's description of Goad's *modus operandi* matched that used in a number of home burglaries in the area subsequent to Goad's release. Kretschman also testified that King recounted specific information about the Maple Bluff burglary that could only have come from the perpetrator. Specifically, King informed the police that Goad had stated that he monitored police broadcasts during the burglaries with a handheld police scanner. King informed the officer that when Goad heard the police dispatched over the police scanner, he grabbed two Rolex watches and exited the premises. King stated that Goad told him he was already at his mother's house when he heard that the police entered the residence. Goad later pawned the two Rolex watches in Chicago. King knew this because he traveled with Goad to Chicago and paid for their bus tickets while Goad paid for their lodging.

Detective Kretschman also described to the court the method King explained that Goad used to determine which houses to burglarize. Thomas King informed Kretschman that

> the method Goad used to determine his target homes was for him to go to the Madison City Library, take specific streets, ... and look at the affluence reading which is available indicating the income code of the people living on those streets. It also gives the street address which correlates to the telephone number. Mr. Goad would then call those numbers and set up a little chart [to reflect answered calls and unanswered calls].... Eventually that chart would indicate who was not occupying the residence such as being on vacation. These were the targeted houses.

Thereafter, Goad would case the house to determine if it had a security system. If it did, Goad would call the security system office or the alarm manufacturer posing as a

---

**3.** Goad claimed he was unable to prepare for his hearing due to a lack of legal materials at the

jail, and Stokes's failure to provide him with the evidence against him.

prospective buyer, and, after asking questions would attempt to ascertain whether the security system would be operational if the phone lines were de-activated. Afterward, Goad would telephone the residences a number of times, and, upon finding one unoccupied, burglarize it. Detective Kretschman testified that he had obtained Goad's phone records, and confirmed that several calls were placed from Goad's home to the victims' houses.

Kretschman further testified that a search of Goad's home uncovered a police scanner, found in Goad's bedroom, which was programmed to the Dane County burglary response police frequencies. The search also uncovered a catalog of frequencies,[4] with two local frequencies highlighted. Finally, Kretschman testified that when he arrested Goad, he found a receipt from a Chicago motel in the accused's wallet.[5]

The detective also informed the court that Goad's mother corroborated King's statement that King had stayed with her son at her house, and that her son had told her that King had taken valuables from him. Goad's mother also confirmed that the police scanner and the jacket stained with insulating foam belonged to her son.[6]

Goad cross-examined Detective Kretschman with Stokes acting as his standby counsel. Goad questioned the detective as to Thomas King's credibility as a convicted felon. Goad specifically asked the detective about King's opportunity to make calls to the burglarized residences from Goad's home, as well as King's possession of the stolen silver and jewelry.[7] Goad tried to raise a question as to the ownership of the police scanner and

frequency catalog, as well as the jacket stained with insulating foam.[8] After conducting a vigorous cross-examination,[9] Goad declined to testify or offer any evidence in his defense.

Goad argued that his friend Thomas King was the perpetrator of the burglaries and had much to gain by implicating Goad. Goad characterized the evidence against him as "based solely on the lame and double hearsay evidence in the form of a written hearsay statement from a convicted felon." The district court was unpersuaded. The court found that Goad was responsible for the burglaries and had violated the terms of his supervised release. The court found that Goad had committed the burglary in Maple Bluff and had traveled to Chicago to pawn the stolen watches. The court also determined that it was "undisputed" that Goad had violated his supervised release by associating with a known felon, Thomas King. Judge Shabaz stated that he was "reasonably satisfied," based on Officer Kretschman's testimony and the other corroborating evidence presented, that Goad violated the conditions of his supervised release. The court revoked Goad's release and sentenced him to twenty-four months of incarceration.

## II. DISCUSSION

### A. Standard of Proof

■ Goad contends that the district court applied an improper standard of proof when Judge Shabaz stated that he was "reasonably satisfied that the probationer has violated the conditions of his probation, and that, accordingly, revocation of probation is appropri-

---

4. The Sheriff's Department confirmed through its investigation that the defendant himself purchased both the scanner and the catalog of police frequencies at a local electronics store.

5. The date inscribed on the receipt corresponded to the days King claimed the two traveled to Chicago in order to pawn the stolen watches.

6. Goad demonstrated his knowledge and experience with the presentation of evidence during criminal proceedings throughout the direct examination of Detective Kretschman, by repeatedly objecting to the admission of statements as hearsay and double hearsay.

7. Goad asked Kretschman, "You testify that some phone calls were made from my house. Do you have any evidence that King was not at my house during these dates and that the phone calls were made?"

8. Goad asked, "And since King was staying at my house, it's possible that he left [the scanner] at my house?" Goad also attempted to establish that his mother owned the police scanner.

9. Goad's cross-examination alone consisted of 23 pages of the hearing transcript and reflected his ability to evaluate and question a witness as well as his knowledge of courtroom procedure.

ate—revocation of supervised release is appropriate in this matter." The defendant argues that 18 U.S.C. § 3583(e)(3) requires a court to find violations of a felon's supervised release through the "preponderance of the evidence" standard,[10] rather than the "reasonably satisfied" standard applicable to the revocation of probation.

■ Whether the district court applied the correct standard of proof is a question of law, subject to de novo review. *United States v. Church,* 970 F.2d 401, 404 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1009, 122 L.Ed.2d 157 (1993). As we recognized in *United States v. Dillard,* 910 F.2d 461, 464 (7th Cir.1990) *(per curiam )* the standard of proof for revocation of supervised release is governed by statute.[11] To revoke a defendant's supervised release under 18 U.S.C. § 3583(e)(3), the district court must find by a preponderance of the evidence that the defendant violated the terms of his supervised release.

Our review of the record convinces us that the district court applied the proper standard of review. Supervised release, probation, and parole[12] are by their very nature similar

correctional programs which place somewhat comparable restrictions on a convicted person's freedom.[13] Nonetheless, Congress required the higher, preponderance of the evidence standard of proof for the revocation of supervised release when it passed the Comprehensive Crime Control Act of 1984. *See* 18 U.S.C. § 3583(e)(3). Different standards of proof apply depending on which form of post-incarceration release a defendant is serving. To revoke a defendant's term of probation, the government must establish to the *reasonable satisfaction* of the district court that the defendant violated the terms of the probation. To revoke a defendant's supervised release, the government must establish by a *preponderance of the evidence* that the defendant violated the terms of the supervised release.

Only once during the entire sentencing hearing (as reflected in the 63–page transcript) did Judge Shabaz mention that he was "reasonably satisfied" with the proof of Goad's violations. In contrast, the judge cited the proper statute in his written order, 18 U.S.C. § 3583(e). Moreover, the written order specifically commented on the over-

---

**10.** 18 U.S.C. § 3583(e)(3) provides:

> The court may ... revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release without credit for time previously served on postrelease supervision, if it finds *by a preponderance of the evidence* that the person violated a condition of supervised release,....
> *Id.* (emphasis added).

**11.** We also recognize that in *United States v. Fleming,* 9 F.3d 1253, 1254 (7th Cir.1993) *(per curiam )* this court applied the "reasonably satisfied" standard to review a district court's revocation of an accused's supervised release. Because we agree with the court in *Dillard* that the preponderance of the evidence standard is mandated under the statute, we apply that standard in this case.

**12.** The Sentencing Reform Act of 1984 abolished parole. However, because there are still inmates in federal correctional facilities that were sentenced under the pre-Act law, those prisoners are eligible for early release. *See, e.g., Skowronek v. Brennan,* 896 F.2d 264, 266–67 (7th Cir.1990).

**13.** The Introduction to Chapter 7 of the Sentencing Guidelines explains the subtle differences between supervised release and probation:

> Supervised release, a new form of post-imprisonment supervision created by the Sentencing Reform Act, accompanied implementation of the guidelines. A term of supervised release may be imposed by the court as a part of the sentence of imprisonment at the time of initial sentencing. 18 U.S.C. § 3583(a). Unlike parole, a term of supervised release does not replace a portion of the sentence of imprisonment, but rather is an order of supervision in addition to any term of imprisonment imposed by the court. Accordingly, supervised release is more analogous to the additional "special parole term" previously authorized for certain drug offenses.
> With the exception of intermittent confinement, which is available only for a sentence of probation, the conditions of supervised release authorized by statute are the same as those for a sentence of probation. When the court finds that the defendant violated a condition of supervised release, it may continue the defendant on supervised release, with or without extending the term or modifying the conditions, or revoke supervised release and impose a term of imprisonment. The periods of imprisonment authorized by statute for a violation of the conditions of supervised release generally are more limited, however, than those available for a violation of the conditions of probation. 18 U.S.C. § 3583(e)(3).

whelming evidence against Goad. In light of the substantial, overwhelming, and convincing evidence against Goad, and the court's solitary reference to the incorrect standard of proof, we are persuaded, from our review of the record, that the district court did in fact apply the preponderance of the evidence standard to the proof presented at Goad's hearing.

### B. *Fifth Amendment Privilege Against Self–Incrimination*

■ Goad argues that the district court violated his Fifth Amendment privilege against self-incrimination when it found that his association with King was "undisputed." Goad asserts that the district court could not have made such a finding without construing Goad's questions to Officer Kretschman during cross-examination as admissions. We disagree.

The government presented substantial and convincing evidence establishing that Goad associated with a known felon. King explained to the authorities that he and Goad were incarcerated at Sandstone Prison at the same time, where Goad had described to King his cleverness in circumventing residential security systems. King also stated that he had recently traveled with Goad to Chicago to pawn two Rolex watches stolen from a local residence. King also stated that he had stayed for two nights with Goad at Goad's mother's home in Madison. Goad's mother corroborated King's brief visit.

Goad presented no evidence in rebuttal. In his summation, Goad attacked King's credibility, but, having presented no rebuttal evidence, was unable to point to any evidence to contradict the substance of King's statements to the police that Goad had been responsible for the recent home burglaries and that Goad had accompanied King to Chicago to pawn the stolen items. The district court's finding that Goad's association with King was undisputed was fairly supported by the evidence.

### C. *Sixth Amendment Right to Counsel*

■ Goad argues that the trial court violated his Sixth Amendment right to counsel when it allowed him to proceed *pro se* alleg-

edly without making an adequate inquiry as to whether he was capable of defending himself, and in the alternative, that the record demonstrates that his waiver of the right to counsel was neither knowingly nor voluntarily made. Goad contends that the district court had an obligation to question Goad about his ability to conduct his own defense, his understanding of the proceedings, including the standard of proof, his education, and his knowledge of the consequences of waiving counsel. We disagree.

This court, in considering the scope of the court's inquiry into a defendant's waiver of Sixth Amendment rights, has concluded that "[w]hile more extensive discussions may be valuable and are encouraged, it suffices that a defendant know the character of the risks at stake and proceed with his eyes open." *United States v. Colonia,* 870 F.2d 1319, 1327 (7th Cir.1989) (citing *United States v. Roth,* 860 F.2d 1382, 1388–89 (7th Cir.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2099, 104 L.Ed.2d 661 (1989)). In *United States v. Berkowitz,* 927 F.2d 1376 (7th Cir.1991), we explained the district court's responsibility to inquire of a defendant who asserts his right to self-representation:

> [T]he Supreme Court [has] held that criminal defendants have a constitutional right to self-representation. But before permitting a defendant to exercise this right, the trial judge must ensure that the defendant has knowingly and voluntarily waived his Sixth Amendment right to counsel. To do this, the judge should advise the defendant about and try to ensure he understands the benefits associated with the right to counsel, the pitfalls of self-representation, and the fact that it is unwise for one not trained in the law to try to represent himself.... [T]he district judge should engage in "a thorough and extensive inquiry of [the defendant] by asking [him] his age and degree of education; informing him of the crimes with which he was charged and the maximum possible sentences; determining that [he] underst[ands] the nature of the charges; ascertaining that he ha[s] copies of the Federal Rules of Evidence and the Federal Rules of Civil Procedure and instructing him to read them and to

abide by them, whether read or not; and telling [him] that he would be expected to conduct himself in accordance with those rules."

*Id.* at 1383 (citations omitted).

The defendant urges us to adopt a *per se* rule that would require a specific inquiry into a defendant's education, criminal history, and understanding of the legal process, as a prerequisite to a knowing and intelligent waiver of Sixth Amendment rights. We have consistently refused to adopt such a rule, and see no reason to change our opinion at this time. *See United States v. Moya–Gomez,* 860 F.2d 706, 734 (7th Cir.1988), *cert. denied sub nom. Estevez v. United States,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989); *United States v. Mitchell,* 788 F.2d 1232, 1235 (7th Cir.1986). In *Moya–Gomez,* we agreed with the majority of courts that "the ultimate question is not what was said or not said to the defendant but rather whether he in fact made a knowing and informed waiver of counsel" in the opinion of the court. *Moya–Gomez,* 860 F.2d at 733.

In *Moya–Gomez,* the defendant, who was accused of heading an extensive cocaine network and faced life imprisonment were he convicted, did not understand English and required the services of an interpreter throughout the proceedings. The court offered to appoint an attorney, but the defendant refused. The court in this instance inquired as to neither the defendant's education, understanding of the law, nor his familiarity with the criminal process. Nonetheless, this court held that "the fact that [the defendant] was repeatedly advised of his right to have counsel appointed weighs in favor of a finding of waiver." *Moya–Gomez,* 860 F.2d at 734. The court determined that the defendant's waiver was valid, despite "the limited scope of [the district court's] inquiry." *Id.* at 736.

Similarly, in *Mitchell,* we refused to hold that a "failure to inform a defendant more

completely of the dangers of waiving counsel rises to the level of reversible error." *Mitchell,* 788 F.2d at 1235. In *Mitchell,* the defendant, who was charged with bank robbery, claimed he deserved substitution of counsel based on his attorney's failure to establish "any relationship" with him. *Id.* at 1236. The defendant explained to the court that he and his attorney had had "heated arguments" and "differences in this thing all the way." The defendant professed ignorance of the "legal terms" for the "things [he] need[ed] to say ... to establish [his] innocence." The district court advised the defendant against self-representation, and explained that "there will be many occasions where possibly objections should be made that you will not recognize that should be made." *Id.* at 1235 & n. 2. Nonetheless, we recognized that "there is no constitutional right to a 'meaningful [*i.e.* harmonious] attorney-client relationship,' ... and therefore, the trial court did not offer Mitchell an impermissible choice by requiring him to proceed either *pro se* plus standby counsel or with an attorney he didn't like." *Mitchell,* 788 F.2d at 1236 (quoting *Morris v. Slappy,* 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617–18, 75 L.Ed.2d 610 (1983). We concluded that "Mitchell's decision to proceed with ... standby counsel constituted a knowing and intelligent waiver of his right to counsel." *Id.*

Based upon our review of the record, we are convinced that the trial court made an adequate inquiry into Goad's ability to represent himself and his understanding of the proceedings. The district judge had had numerous opportunities to assess Goad's intelligence and familiarity with legal proceedings, including Goad's 1990 bank fraud prosecution, pre-trial and post-trial hearings, as well as Goad's sentencing hearing. Judge Shabaz had examined Goad's presentence report which contained a detailed description of Goad's life history including his education [14] and criminal history.[15] Judge Shabaz was

---

14. Goad dropped out of school in the tenth grade, but earned his General Education Degree (G.E.D.) while in confinement following an adjudication of juvenile delinquency. Goad also enrolled in a business law class at a technical college but withdrew before completing his coursework.

15. Goad was no stranger to the criminal justice system. His presentence report listed fifteen juvenile arrests, as well as an adjudication of juve-

well versed in Goad's background, including his age, education, knowledge and experience with the criminal justice system.[16]

The record also demonstrates that Goad was fully informed of the nature of the charges against him. Goad's appointed attorney received a copy of the revocation petition and discussed it with Goad. This petition contained the sheriff's report that described the evidence against Goad. The district court also thoroughly explained the nature of the charges to the defendant at his probable cause bail hearing on April 1, 1993 and once more at his revocation hearing on April 22, 1993. The district judge also assured himself that Goad would be able to understand and participate in the proceedings by providing him with a standby counsel to aid and assist him with any legal or procedural questions he might have during the hearing. The record is lacking in support for Goad's claim that the district court failed to explain either the charges against him or the possible maximum sentence. We are convinced that the district court made an adequate inquiry into Goad's waiver of his Sixth Amendment right to counsel.

▆▆▆ Goad argues that even if the court's inquiry was sufficient, his waiver of his right to counsel was neither knowing nor voluntary. Goad's claim is not a novel one. This court has repeatedly held that:

> It is important that district judges conduct a proper inquiry of and convey the necessary information to a defendant who wishes to represent himself.... Whether the district court honors or denies the defendant's request to represent himself, the defendant is likely to appeal if he loses at trial. The appeal will almost inevitably revolve around whether or not the defendant was fully aware of his right to counsel, the benefits he receives because of that right, and the pitfalls of going alone.

*Berkowitz,* 927 F.2d at 1283. As a court of appeals "[w]e do not lightly conclude that a defendant has waived his right to counsel; indeed, in determining whether a defendant has knowingly and intelligently waived his Sixth Amendment right we will 'indulg[e] every reasonable presumption against waiver.'" *United States v. Belanger,* 936 F.2d 916, 919 (7th Cir.1991) (quoting *Wilks v. Israel,* 627 F.2d 32, 35 (7th Cir.1980), *cert. denied,* 449 U.S. 1086, 101 S.Ct. 874, 66 L.Ed.2d 811 (1981).

Nonetheless, we must defer to the district court's evaluation of a defendant's abilities because

> *[t]he trial judge is in the best position to assess whether a defendant has knowingly and voluntarily waived counsel.* The court will most likely uphold the trial judge's decision to honor or deny the defendant's request to represent himself where the judge has made the proper inquiries and conveyed the proper information, and reaches a reasoned conclusion about the defendant's understanding of his rights and the voluntariness of his decision.

*Berkowitz,* 927 F.2d at 1383 (emphasis added). This court has stated that when considering the validity of a defendant's waiver, "we shall not reverse the district court where the record as a whole demonstrates that the defendant knowingly and intelligently waived his right to counsel." *Moya–Gomez,* 860 F.2d at 733 (quoting *Mitchell,* 788 F.2d at 1235). Therefore,

> [t]he real question when a criminal defendant waives counsel is not the quality of the trial judge's inquiry; rather, it is whether the defendant knowingly and voluntarily waived his right to counsel. Thus, if a formal inquiry is deficient, or even lacking, we will not reverse the defendant's conviction if the record as a whole demon-

---

nile delinquency for committing nine separate burglaries. Goad was convicted as an adult for burglary, vehicle theft, driving under the influence, and retail theft. In addition, at the time of his arrest for bank fraud in 1990, he faced pending charges for forgery, unlawful use of a driver's license, driving under a revoked license, interference with fire-fighting equipment and resisting arrest.

**16.** *See Berkowitz,* 927 F.2d at 1384 (the defendant's educational background and prior experience in court as reflected in the information available to the trial judge weighed towards a finding of waiver without a specific inquiry from the bench).

strates the defendant knowingly and voluntarily waived his right to counsel.

*Berkowitz,* 927 F.2d at 1383 (citing *Moya–Gomez,* 860 F.2d at 733).

Here, the district court's inquiry was far more thorough than the court's in *Moya–Gomez.* The district court was familiar with Goad's extensive experience as a defendant in the criminal justice system. *See supra* note 15. The district court ensured that Goad understood the charges against him and the possible sentence he faced. The court appointed Stokes as standby counsel and advised Goad that Stokes would be available "to answer those legal questions [and] concerns which [he] wish[ed] to discuss." Moreover, the judge specifically asked Goad if he was prepared to defend himself, to which Goad replied "Yes, I am, sir." We are of the opinion that the district court did everything in its power to convince Goad to reconsider his decision to proceed *pro se.* We are convinced that the record as a whole supports our holding that Goad was provided with sufficient information to make a knowing and intelligent waiver of his right to counsel.

### D. *Defendant's Motion for Substitution of Counsel*

 Finally, Goad argues that the district court abused its discretion when it denied his motion for substitution of counsel. Goad based his motion on his alleged "hostile relationship" with Stokes, which originated during Goad's plea negotiations for his 1990 bank fraud conviction, and was bolstered by Stokes's allegedly ineffective performance of his duties before Goad's revocation of supervised release hearing.[17]

 We review the denial of a motion for substitution of counsel only for abuse of discretion, provided that the defendant has been given an opportunity to explain the reasons for his request. *United States v.*

*Hillsberg,* 812 F.2d 328, 333 (7th Cir.), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). "Unless there is a demonstrated conflict of interests or counsel and defendant are embroiled in an 'irreconcilable conflict' that is 'so great that it resulted in a total lack of communication preventing an adequate defense,' there is no abuse of discretion in denying a motion for new counsel." *United States v. Morris,* 714 F.2d 669, 673 (7th Cir.1983), *quoted in United States v. Cole,* 988 F.2d 681, 683 (7th Cir.1993). On review, we consider several factors, including the adequacy of the court's inquiry into the substitution of counsel motion, the timeliness of the motion, and whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense. *United States v. Zillges,* 978 F.2d 369, 372 (7th Cir.1992).

The record reflects that Judge Shabaz made a detailed inquiry into Goad's reasons for seeking the appointment of new counsel. In response, Goad emphasized not any potential or existing conflict with Stokes, but his confusion regarding the Sentencing Guidelines. Judge Shabaz attempted to clarify Goad's exposure under the Sentencing Guidelines, and Goad expressed no further concerns with Stokes's performance. From this record, we are convinced that the district court conducted an adequate inquiry into Goad's reasons for the filing of his motion requesting substitution of counsel.

Goad's initial claim that the Probation Department's recommendation of Stokes for Goad's appointed attorney created a conflict is without merit. The Probation Department recommended Stokes because he had previously represented Goad during Goad's 1990 prosecution for bank fraud. Stokes was familiar with Goad's conviction, the terms of his supervised release, and had an existing working relationship with Goad. The district court could have elicited this same informa-

---

17. Goad cites his attorney's decision to file an *Anders* no merit brief as evidence of their problematic relationship. This argument misses the mark. An attorney has an ethical duty to refrain from making frivolous arguments to the court. *United States v. Gomez,* 24 F.3d 924, 926 (7th Cir.1994). An attorney may fulfill that obligation by filing an *Anders* no merit brief. Moreover, Stokes filed this brief *after* the district court denied Goad's motion for substitution of counsel. In our evaluation of the district court's exercise of discretion in denying Goad's motion, we will not consider evidence that was not before the district court.

tion from Goad; the fact that the Probation Department provided it for the court is of no consequence.

Goad failed to present any evidence of conflict, either potential or actual, that would preclude Stokes from providing him with an adequate defense. Goad claimed that a "long-term documented hostile relationship" existed between Goad and Stokes, which prevented the presentation of an adequate defense. The origin of this dissonant relationship was allegedly Stokes's representation of Goad during his 1990 plea negotiations which resulted in a bank fraud conviction. Goad filed a motion for substitution of counsel during that proceeding as well. After an *ex parte* hearing with both Goad and Stokes, the magistrate ruled that Goad had failed to present sufficient reasons to justify the replacement of Stokes. Goad presented no additional evidence to the district court to call into question the magistrate's decision; therefore we will not revisit here Stokes's 1990 representation of Goad.

 Goad also claims that Stokes did not cooperate with him in his preparation for the revocation hearing and, as a result, Goad was unprepared for that hearing. An attorney is required to "consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Goad asserts that Stokes failed to meet the *Strickland* standard, in that he failed to apprise him of "the basis of the revocation petition, the evidence the government intended to present against him, and the sentencing implications of the allegations." The record does not support Goad's allegations. All of the proceedings before the district court reflect a civil and cooperative, albeit reserved, relationship between Goad and his appointed

counsel. At Goad's probable cause bail hearing on April 1, 1993, Stokes advised the district court that he had had a brief opportunity to discuss the nature of the petition for revocation with Goad. Later, when Goad requested new counsel, Goad stressed his confusion over the Sentencing Guidelines to the court, not any dissatisfaction with his counsel. Goad consented to the district court's appointment of Stokes as standby counsel. Obviously Goad would not have agreed to Stokes's assistance had there been any "irreconcilable conflict" or "total breakdown in communication" between them. Goad conferred with Stokes on numerous occasions during his revocation hearing and never once voiced any displeasure regarding the advice he received. Moreover, Goad admitted in his summation that he had met with Stokes the evening before the hearing for "one or two hours to review what we [sic] had said." [18] This record falls far short of demonstrating an irreconcilable conflict or total lack of communication between the accused and his appointed counsel.

This court has held that the denial of a motion to substitute alleging only "ethereal distrust" of counsel is not reversible error. *Morris,* 714 F.2d at 673. Nor do "personality conflicts and disagreements over trial strategy" constitute grounds for reversal. *Hillsberg,* 812 F.2d at 333–34 (quoting *United States v. Davis,* 604 F.2d 474, 479 (7th Cir.1979)). As a criminal defendant, Goad had a right to appointed counsel, but he had no right to select his own appointed counsel. *See Slappy,* 461 U.S. at 13–14, 103 S.Ct. at 1617–18. This was not a complex legal proceeding, such as a trial or difficult motion hearing, where a defendant might be prejudiced by a lack of legal knowledge. The only questions relevant to this proceeding were the credibility of the witnesses and the strength of the evidence against the accused.

---

**18.** Although Goad did not specifically complain that he had insufficient time to consult with Stokes, he did state to the court that he had only a few hours to discuss his defense with his attorney. We note that the amount of time an accused has to consult with his attorney is of itself not an important consideration. "We know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide ef-

fective assistance of counsel." *United States ex rel. Kleba v. McGinnis,* 796 F.2d 947, 954 (7th Cir.1986). In *Olson,* we recognized that "a very capable criminal lawyer can get more out of one interview with a client than a neophyte lawyer can get out of a similar meeting." *Id.* at 954 (internal quotations omitted), *cited in United States v. Olson,* 846 F.2d 1103, 1108 (7th Cir.), *cert. denied,* 488 U.S. 850, 109 S.Ct. 131, 102 L.Ed.2d 104 (1988).

As Judge Shabaz noted, "[t]he Court is not aware of that law which would be applicable in this case other than the general law which has been provided to [Goad] by the Court at the previous hearing, and the Court further is of the opinion that the key to this matter is the testimony which has been provided which has gone unrebutted without any refutation whatsoever." Goad had standby counsel to assist him with any legal question that arose. We agree with the district court that Goad's appointed attorney met the *Strickland* standard, and, that "even had the defendant's counsel done what the defendant apparently believes would have been appropriate, the result would not have been any different."

Finally, Goad's delay in making his motion for substitution of counsel deserves comment. Goad waited eighteen days—from April 1, 1993, the day of his arraignment, until April 19, 1993, the day of his scheduled revocation hearing—to make his motion for substitution of counsel. The court refused to appoint a new attorney, but allowed Goad to proceed *pro se* and went so far as to give him an additional three days to prepare and then to give him standby counsel. Once again, Goad waited until the last possible moment—at his rescheduled revocation hearing—to abandon his request to proceed *pro se* and renew his request for appointed counsel. Goad's tactics are a common illustration of the procedural manipulation district courts face time and time again in trying to effectively render justice in the most efficient and judicious manner while attempting to manage overburdened caseloads. "The problem is, savvy criminal defendants have learned to manipulate the system by withdrawing requests for self-representation at the eleventh hour ... in order to cause delay." *United States v. Tolliver*, 937 F.2d 1183 (7th Cir.), *cert. denied*, 502 U.S. 919, 112 S.Ct. 329, 116 L.Ed.2d 269 (1991); *see also United States v. Studley*, 892 F.2d 518, 522 n. 4 (7th Cir.1989) ("[e]xperienced trial judges are well aware that ... [a] request for a new appointed counsel after earlier requesting to proceed *pro se* ... is frequently nothing more than a stalling tactic ... [that] should be treated as

such by the trial court"). The untimeliness of Goad's motion for substitution of counsel also supports the district court's decision to deny his request. We are convinced that the district court did not abuse its discretion in refusing Goad's motion for substitution of counsel.

### III. CONCLUSION

The district court's decision to revoke Goad's supervised release is

AFFIRMED.