# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 9, 2015          Decided July 28, 2015

No. 08-3037

UNITED STATES OF AMERICA,
APPELLEE

v.

GREGORY BELL, ALSO KNOWN AS BOY-BOY, ALSO KNOWN AS
BUNGA,
APPELLANT

Consolidated with 11-3032

Appeals from the United States District Court
for the District of Columbia
(No. 1:05-cr-00100-2 and -3)

*Sicilia C. Englert* and *Robert S. Becker*, appointed by the court, argued the causes for appellants. With them on the joint briefs was *Michael E. Lawlor*, appointed by the court.

*James M. Perez* and *Stratton C. Strand*, Assistant U.S. Attorneys, argued the causes for appellee. With them on the briefs were *Ronald C. Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman* and *John P. Mannarino*, Assistant U.S. Attorneys. *Elizabeth H. Danello*, Assistant U.S. Attorney, entered an appearance.

Before: HENDERSON, BROWN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Opinion dissenting in part and concurring in part filed by *Circuit Judge* WILKINS.

BROWN, *Circuit Judge*: "[L]ike a bad penny, it return[s] to [us] again." Letter from Abigail Adams to Mary Smith (Oct. 6, 1766) (referencing unattributed aphorism). We revisit the Congress Park Crew ("Crew"), "a loose-knit gang that ran a market for crack cocaine in the Congress Park neighborhood of Southeast Washington, D.C., for nearly thirteen years." *United States v. Jones*, 744 F.3d 1362, 1365 (D.C. Cir. 2014). Previously, we affirmed the sentences imposed on three of six jointly-tried Crew members; two additional members now appeal: one challenging his conviction and both challenging their sentences. We affirm the district court.

## I

In 2005, eighteen Congress Park Crew members were indicted on various crimes including conspiracy and crack distribution. Eleven members pleaded guilty and one member was tried separately in 2006; the remaining six Crew members were tried together in 2007. In *Jones* we found the district court did not err in its sentencing of three of the jointly-tried Crew Members—Joseph Jones, Desmond Thurston, and Antwuan Ball. *Id.* at 1367–70. The present consolidated appeal concerns two additional Crew members tried in 2007—David Wilson and Gregory Bell (collectively "Defendants"). Wilson was convicted of two counts of aiding

and abetting first-degree murder, seven counts of distributing crack cocaine, and one count of using a communications facility in relation to a narcotics offense. Bell was convicted of three counts of distributing crack cocaine. The Defendants were acquitted of a mélange of other charges including all narcotics and racketeering conspiracy charges and, in Wilson's case, a third count of aiding and abetting murder.

Wilson challenges his conviction at trial. He claims ineffective assistance of counsel based on substitutions of his defense attorneys, that two uncharged murders were improperly admitted into evidence, and that the Government failed timely to produce pieces of exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Both Defendants also challenge the sentences imposed on them for crack cocaine distribution. We address each issue in turn.

## II

Wilson's most facially credible argument is that substitutions of trial counsel deprived him of effective representation. But we are ultimately unpersuaded by his theory on appeal, which hinges on an extension of the doctrine of presumptive prejudice.

## A

The course of Wilson's representation was marked by a number of substitutions of his lead and secondary court-appointed counsels.[1] We summarize the substitutions most pertinent to the present appeal. In January 2007—

---

[1] Secondary counsel was appointed because the Government could seek the death penalty on certain charged offenses.

approximately two months prior to trial—Jenifer Wicks assumed the role of lead counsel, after previously assisting as secondary counsel for several years. On February 5, 2007, Gary Proctor was appointed to assist Wicks, and trial began on February 13, 2007. Approximately four months into trial, and shortly before the close of the Government's case, Wicks was hospitalized then subsequently released with medical instructions to refrain from stressful work. In Wicks's prolonged absence Proctor filed a motion for mistrial or severance. Proctor asserted he was, in his view, unable to adequately represent Wilson because, *inter alia*, he had limited federal trial experience[2] and had missed significant portions of the Government's case at trial, amounting to approximately one third of the Government's case by Proctor's unverified but uncontested estimation.

The district court initially granted severance but the Government sought reconsideration, proposing a "brief continuance[,] . . . a week or two, to allow Mr. Proctor to get up to speed," before allowing the Government "to finish its five to six days or so of its case," then a longer continuance ("a month and a half"), to provide Proctor time to prepare Wilson's case in defense. J.A. 3383–84. Finding the Government's proposal "eminently fair," J.A. 3386, the district court reversed its earlier grant of severance. Secondary counsel[3] was appointed to assist Proctor in his new

---

[2] Proctor did, however, possess considerable state trial experience, including participating, by his own estimate, in "perhaps" a dozen death penalty cases in five states. He also served as a second chair in a prior federal criminal trial.

[3] Matthew Davies was appointed on June 28. The court recessed until July 9. The Government concluded its case on July 17. The court recessed again until August 21. *See* J.A. 3408, 3215.

role as lead counsel, and trial resumed in general accordance with the Government's proposal.

Proctor represented Wilson as lead counsel through the remainder of trial arguments. Although the dissent assumes Wicks's departure from the case robbed the defense of the benefits of her prior work, Proctor's ability (or inability) to directly consult with Wicks, in preparing and conducting Wilson's defense at trial, is sparsely developed in the record before us. *But see* J.A. 3417 (indicating Wicks had at least some capacity to accept telephone calls, albeit without providing insight into the extent of her availability or to what extent Proctor or Davies employed Wicks as a resource), 3486 (Proctor noting he "dragged Ms. Wicks out of retirement one more time," to be present in the courtroom during his closing arguments).[4]

**B**

Despite being acquitted on a number of serious offenses—including counts of aiding and abetting murder,

---

[4] The dissent suggests there is no reasonable expectation that Wicks could significantly assist in the defense, based on her doctor's orders. *See* Dissenting Op. at 18 n.2. Wicks's doctor's instructions make clear Wicks "need[ed] to be off work for . . . 2 weeks [following her hospitalization] and [could] not return to trial work for [an] additional 6 months." J.A. 739. But we do not find these instructions sufficient to determine Wicks's unavailability to consult with Proctor, except perhaps in the two weeks immediately after her hospitalization. *See also* J.A. 3399 ("A fair reading of that letter . . . is that after two weeks or so time, Ms. Wicks is available in some capacity, whether it's assisting, writing direct exam outlines, preparing witnesses in her office, consulting, doing something along those lines.").

assault with intent to murder, and RICO and narcotics conspiracy—Wilson asserts Proctor's representation fell below the minimum threshold of professional competence required by the Sixth Amendment. *See generally Strickland v. Washington*, 466 U.S. 668 (1984). Rather than identifying deficiencies in Proctor's actual representation and then arguing prejudice under *Strickland*'s two-part test, *see id.* at 687–88, Wilson argues Proctor's representation was presumptively unreliable.

In *United States v. Cronic* the Supreme Court identified three "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. 648, 658 (1984). *See also Woods v. Donald*, 135 S. Ct. 1372, 1378 (2015) (reiterating that *Cronic* applies only in such circumstances). "Most obvious, of course, is the complete denial of counsel." *Cronic*, 466 U.S. at 659. The Court also recognized the presumption in the constructive absence of counsel, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," or where "[c]ircumstances . . . [are] present . . . [such that] although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659–60.

Courts have limited *Cronic* to "a very narrow range of situations." *United States v. Hughes*, 514 F.3d 15, 18 (D.C. Cir. 2008); *United States v. Thompson*, 27 F.3d 671, 676 (D.C. Cir. 1994). For example, *Cronic* is only applicable for failure to test a prosecutor's case where "the attorney's failure . . . [is] complete," *Hughes*, 514 F.3d at 18; the presumption is "reserved for situations in which counsel has entirely failed to

function as the client's advocate." *Florida v. Nixon*, 543 U.S. 175, 189 (2004). *Compare Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001) (unconscious attorney presumptively prejudicial, if unconscious during a critical stage of a proceeding), *with Bell v. Cone*, 535 U.S. 685, 696 (2002) (no presumptive prejudice where counsel "failed to mount some case for life after the prosecution introduced evidence in the sentencing hearing and gave a closing statement") (internal quotation marks omitted); *Cronic*, 466 U.S. at 649–50 (presumption inapplicable where a young attorney represented a defendant in a complex mail fraud case, where the attorney specialized in real estate law, it was his first jury trial, and he had twenty-five days to prepare versus the Government's four and one-half years); *Bellamy v. Cogdell*, 974 F.2d 302, 303–04 (2d Cir. 1992) (no *per se* prejudice where 71 year-old defense attorney suffered from a variety of physical ailments that left him "virtually incapacitated" and "at times" unable to concentrate, even where those incapacities led to the suspension of the attorney's license shortly after the defendant's conviction at trial).

Wilson would have us extend *Cronic* to cases where a substitution means at least one *specific* defense counsel was not continuously present during each and every critical stage of trial.[5] In Wilson's view, in cases where counsel is substituted, the duration of the continuance granted to allow substitute counsel to prepare is irrelevant. *See* Reply Brief for Appellant David Wilson at 7, United States v. Bell, No. 08-

---

[5] In this case, Proctor began his representation of Wilson prior to the commencement of trial. In this general sense, Proctor represented Wilson continuously throughout the period of trial, but the crux of Wilson's argument centers on parts of the trial—prior to Proctor's assumption of the lead counsel role—where Wicks was present to represent Wilson but Proctor was absent.

3037 (June 30, 2014) ("Wilson's complaint is not that Proctor [] needed more time to prepare after Wicks became ill; Wilson's argument is that an effective defense was impossible without Wicks."). Because the issues are not factually developed on the record before us, Wilson's theory of presumptive prejudice cannot hinge on the substitute counsel's inability to consult with his predecessor or on prior counsel leaving no substantial trial notes or memoranda to assist in the defense.[6]

The dissent focuses on concerns Wilson never raised—either at trial or on appeal: (1) that the mid-trial substitution led to the irretrievable loss of Wick's strategic consultations with him and (2) that Proctor could not begin his representation with the same well-developed rapport. But, since the Sixth Amendment does not guarantee representation by a single counsel or a meaningful relationship with counsel, *Morris v. Slappy,* 461 U.S. 1, 19-19-20 (1983), the fact that Proctor could not replicate the exact depth of relationship Wilson enjoyed with Wicks—even if true—cannot be the basis of a presumption of prejudice.

Further, the record is inconclusive as to whether Proctor had access to a paralegal who was present for the entire trial and could foster continuity for the defense team after the mid-trial substitution. *See* J.A. 3381 (the Government arguing that Proctor was "not truly alone," in part, because "Ms. Wicks ha[d] a paralegal who's been very involved in the case, [and

---

[6] Although we do not know for certain, Proctor would at least potentially have had access to any notes or memoranda Wicks may have left behind, as he had access to Wicks's office and records after her hospitalization. J.A. 3379 ("I spent half of Friday and most of Saturday in [Wicks's] office just physically trying to figure out where everything is.").

who] certainly must know the files"). Wilson does not point to anything in the record to adequately and concretely demonstrate that Proctor's lead counsel representation began from a completely blank slate. We decline to presume such facts from an underdeveloped record, particularly where—as here—no other party would have been better situated than Wilson to inform the court of any limitations.

Wilson analogizes Proctor to an errant defense counsel whose absence prevents him from "assess[ing] each piece of the government's case[,] observ[ing] how it is received by the jury[,] assess[ing] how it fits into the larger picture of trial[,] and . . . choos[ing] what evidence to present in the defense['s] case." *Id.* at 9. To be sure the complete absence of any dedicated counsel for the accused, during a critical stage of a proceeding, would warrant *Cronic's* presumption. *See, e.g.*, *United States v. Russell*, 205 F.3d 768, 771–72 (5th Cir. 2000); *United States v. Decoster*, 624 F.2d 196, 256 (D.C. Cir. 1976) (en banc) ("[W]here the defendant had no counsel at all at a critical stage of his trial, automatic reversal of his conviction is usually in order."). But where counsel is substituted promptly, there is no impermissible gap in a defendant's representation. The identity of counsel has changed but at each critical stage a defense lawyer was present to actively subject the prosecution's case to "the crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 656. *See Goodwin v. Johnson*, 132 F.3d 162, 176 (5th Cir. 1997) ("When the defendant receives at least *some* meaningful assistance, he must prove prejudice in order to obtain relief for ineffective assistance of counsel.") (emphasis added). *Cf. Carroll v. Renico*, 475 F.3d 708, 713 (6th Cir. 2007) (finding the Supreme Court has not even clearly

established whether a *co-defendant's* counsel standing in for a defendant's absent lawyer is presumptively prejudicial).[7]

The inquiry thus turns on whether substitution of counsel, during the course of trial, is tantamount to a constructive absence of representation or is otherwise a circumstance where no "lawyer, even a fully competent one, could provide effective assistance." *Id.* at 659–60. "The question is not whether counsel in those circumstances will perform less well than he otherwise would, but whether the circumstances are likely to result in such poor performance that an inquiry into its effects would not be worth the time." *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).

Mid-trial substitution may prove disruptive. Even following a continuance, a substitute defense counsel will sometimes be disadvantaged by his absence from earlier proceedings. Indeed, best practice may favor allowing for a severance or mistrial where the prolonged illness or absence of a defense counsel would require substitution. But "best practice" is not the standard for constitutional deficiency. Nor does every disadvantage to the defense's representation, however meagre, suffice to "infect[] [an] entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). *See generally Harrington v. Richter*, 562 U.S. 86, 110 (2011) (the Sixth Amendment "does not guarantee perfect representation, only a 'reasonably competent attorney'").

---

[7] We do not opine on the propriety of such an arrangement, which other circuits—though not the Supreme Court—have suggested is improper. *See, e.g.*, *Olden v. United States*, 224 F.3d 561, 569 (6th Cir. 2000). In the present case, despite substitutions, Wilson was always represented by attorneys dedicated to his defense.

Imaginative theorizing added to rampant conjecture augmented by inapposite examples does not a convincing case for *Cronic's* categorical rule make. Prudence counsels only greater caution when called on to find constitutional inadequacy as a *per se* matter, particularly where the state of the record requires speculation as to deficiencies that may or may not have existed. In this case, even the particular days Proctor missed prior to the substitution is not beyond contention. *See generally* Government's Brief at 25 & n.10, United States v. Bell, No. 08-3037 (June 30, 2014) (noting that Proctor's estimate that he missed one-third of the trial was neither expressly endorsed by the court nor confirmed below).

If any break in the continuity of counsel at trial were sufficient to create a presumption of prejudice, even where a *different* attorney for the accused was present at critical stages missed by the substitute lead counsel, the Sixth Amendment's guarantee would resemble less the assurance of "effective" representation and instead demand something closer to a "perfect" defense. While perfection may seem a laudable goal, this latter threshold of performance is not demanded by our Constitution. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006) (right to counsel guarantees "*effective* (not mistake-free) representation"). *Cf. Jackson v. Johnson*, 150 F.3d 520, 525 (5th Cir. 1998) ("A constructive denial of counsel occurs . . . in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.") (quoting *Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir.1997)).

Wilson emphasizes that, unless the lawyer assuming the lead counsel role was continuously present at trial prior to the substitution, he will have been unable to physically "observ[e]

witnesses as they testify [or] . . . how the jury receive[d] the evidence" for any days missed. Brief for Appellant David Wilson at 35, United States v. Bell, No. 08-3037 (June 30, 2014). Substitute lead counsel is instead left to review the trial transcript; evaluate notes or memoranda left by substitute counsel's predecessor; or engage in second-hand consultation with the former lead counsel, if available.[8]

Review of the trial transcript or other records is, at times, an imperfect substitute for being present. Indeed, courts often acknowledge that "a cold record cannot recreate testimony. A witness may be credible on paper but not on the stand." *Harvard v. Florida*, 459 U.S. 1128, 1134 (1983).[9] This does not mean, however, that it is impossible for an attorney to

---

[8] Although they do not specifically address mid-trial substitutions, ABA Guidelines on the performance of defense counsel in death penalty cases recommends counsel, and other members of the defense team, "maintain[] the records of [a] case in a manner that will inform successor counsel of all significant developments relevant to the litigation," provide successor counsel with client files and all other information relevant to the representation, "share potential further areas of legal and factual research with successor counsel," and cooperate with successor counsel's "professionally appropriate legal strategies." Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 1074 (2003).

[9] This maxim is frequently employed to rationalize the greater deference appellate tribunals grant trial judges when reviewing issues of credibility. *See, e.g.*, *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (U.S. 1985). Nonetheless, there is no *per se* rule against mid-trial substitution of judges. *See United States v. Thomas*, 114 F.3d 228, 254 (D.C. Cir. 1997) ("[T]he complexity of a case and the abundance of evidence typically determine the extent of the review necessary to familiarize a successor judge with the record . . . ."). S*ee generally* FED. R. CRIM. P. 25(a).

make sound assessments of credibility in the absence of direct observation of trial testimony. Even if it does not perfectly substitute for in-person observation, trial transcripts can provide insight into issues of reliability. Inconsistent statements; defensive, evasive, or ambiguous answers; and the nature of follow-up questions asked may all offer a window into the reliability of a witness' comments and are frequently discernable based on a substitute counsel's review of the transcripts alone, even assuming the absence of any trial notes or other commentary from the predecessor defense counsel.

There may be cases where a defendant is constitutionally prejudiced by his substitute counsel's inability to directly evaluate a critical witness's demeanor at trial because, for example, prior counsel was unavailable to consult and left no material records or notes, the transcript of the witness's testimony was highly ambiguous, and the prosecution's case significantly hinged on the particular witness' recitation. But constitutional prejudice does not automatically flow in every case where counsel is substituted mid-trial.[10] *See United States v. Griffiths*, 750 F.3d 237, 239 (2d Cir. 2014) (per curiam) ("We hold that there is no *per se* violation of the Sixth Amendment right to be represented by one's counsel of choice and to effective assistance of counsel when a district court, after defense counsel has become incapacitated, appoints counsel, over defendant's objection, to deliver the defense summation, notwithstanding the fact that appointed counsel did not witness the presentation of the evidence.").

---

[10] If we adopted Wilson's theory, a mid-trial substitution would perhaps only be permitted if the substitute counsel was present during all critical stages *prior* to his substitution.

That a mid-trial substitution of counsel may potentially increase the likelihood of strategic blunders by the defense does not invalidate the prudence of inquiring whether, in a given case, mistakes of constitutional dimension were *actually* made. *Cf. Childress*, 103 F.3d at 1229 ("[W]e have consistently distinguished shoddy representation from no defense at all. . . . [B]ad lawyering, regardless of *how* bad, does not support the [*per se*] presumption of prejudice under *Cronic*.").[11]   A challenge to the mid-trial substitution of Proctor calls for "precisely the type of probing and fact-

---

[11] In some cases, it may prove challenging to show precisely how a substitution of counsel affected the course of performance—a factor that we have, at times, considered relevant in other contexts. *E.g.*, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (recognizing a limited right to counsel of choice, where counsel is not appointed).  But the challenge of divining how substitutions affected the course of a proceeding are not different in kind from other circumstances where *Strickland* governs. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (indicating *Strickland* governs ineffectiveness claims based on acceptance of a plea bargain). *Cf. Strickland*, 466 U.S. at 710 (Marshall, J., dissenting) (criticizing this aspect of the *Strickland* standard).  Moreover, to say that a substitution of counsel affects the course of a trial is not the equivalent of saying the substitution rendered representation constitutionally ineffective. *See Gonzales-Lopez*, 548 U.S. at 150–51 ("[T]he requirement of showing prejudice in ineffectiveness claims stems from the very definition of the right at issue; it is not a matter of showing that the violation was harmless, but of showing that a violation of the right to effective representation *occurred*. . . . [I]f and when counsel's ineffectiveness 'pervades' a trial, it does so (to the extent we can detect it) through identifiable mistakes.  We can assess how those mistakes affected the outcome."). *See also Strickland*, 466 U.S. at 693 (majority opinion) ("Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.").

specific analysis" that *Strickland* is designed to require. *Sears v. Upton*, 561 U.S. 945, 955 (2010) (per curiam).

We decline to sweep virtually every mid-trial substitution under *Cronic's* blanket rule. *See generally Cronic*, 466 U.S. at 659 n. 26 ("[T]here is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt."); *Appel v. Horn*, 250 F.3d 203, 214 (3d Cir. 2001) ("[T]he majority of Sixth Amendment right to counsel cases are, and should be, analyzed under the ineffective assistance standard of *Strickland* which requires a showing of prejudice."). The *Cronic* inquiry is a largely mechanical one, and we are mindful of avoiding a holding that could open the door to replacing "case-by-case litigation over prejudice with case-by-case litigation over prejudice per se." *Scarpa v. Dubois*, 38 F.3d 1, 14 (1st Cir. 1994) (in the context of finding *Cronic* inapplicable based on claims of substandard attorney performance).

Moreover, we are unpersuaded that a contrary rule would actually prove narrow. The dissent suggests *Cronic* would "only" apply where a "defense counsel is incapacitated mid-trial . . . and no replacement attorney is available who observed the testimony of key government witnesses . . . and participated in material consultations with the defendant." Dissenting Op. at 19. The dissent's logic would extend to most mid-trial substitutions. And this kind of excruciatingly detailed examination of the facts is exactly the circumstance for which *Strickland* is designed.

## III

Wilson also challenges the admission of evidence of two uncharged murders: that Wilson—with the assistance of his

drug supplier, Larry Browne—shot and killed Sam Phillips and that, in a botched robbery of another drug dealer, Wilson and two other co-conspirators killed Reginald Reid.

The lower court deemed the Phillips murder extrinsic to the charged conspiracies, noting it stemmed from a "dispute over an overlapping romantic relationship." J.A. 2133. Nonetheless the murder was admitted under Federal Rule of Evidence 404(b) to show Wilson's access to and familiarity with the use of firearms.

In contrast, the Reid murder was admitted as "intrinsic" to the charged conspiracy because it was "evidence . . . of the development of relationships among the alleged co-conspirators to show the way that the alleged conspiracies grew and were formed and developed, as well as evidence of prior conspiratorial conduct among the alleged conspirators that would be corroborative of the defendant's entry into the charged agreements in the indictment." J.A. 2132.

Our review is for abuse of discretion. *See United States v. Douglas*, 482 F.3d 591, 596 (D.C. Cir. 2007) (Rule 404(b) standard); *see also id.* (review of Rule 403 balancing reviewed only for grave abuse); *United States v. Becton*, 601 F.3d 588, 595 (D.C. Cir. 2010) (applying the Rules 401 and 403 abuse of discretion standard when reviewing if evidence was intrinsic to the charged crime). We find no basis to reverse the district court's judgment.

## A

As to the Phillips murder, the Government makes a threshold argument that Wilson waived his challenge by arguing he should be allowed to offer evidence that the Phillips shooting resulted in Phillips's death. *See Wagner v.*

*Taylor*, 836 F.2d 596, 599 (D.C. Cir. 1987) ("It has long been settled that on appeal a litigant cannot avail himself of an error that he induced the court under review to commit."). We find no applicable waiver. Wilson argued in favor of presenting evidence the Phillips shooting ended in a homicide because the district court had previously held, over Wilson's objections, that the shooting was admissible. In light of the lower court's ruling, Wilson favored presenting evidence the Phillips shooting ended in a homicide under the theory that evidence of a homicide would better show any bias of the Government's witness (Browne), who had allegedly assisted Wilson in the Phillips shooting and was testifying pursuant to the conditions of a plea agreement.

Though not waived, Wilson's merits argument is fruitless. The Phillips murder is admissible to show use of and familiarity with firearms. Knowledge of firearms is a permissible purpose under Rule 404(b). *See* FED. R. EVID. 404(b)(2); *United States v. Miller*, 895 F.2d 1431, 1435 (D.C. Cir. 1990) (the purposes listed in Rule 404(b)(2) are illustrative, not exhaustive). Prior use and familiarity with firearms is relevant to satisfying the scienter requirement to multiple charged offenses, including counts of first degree murder while armed and use of a firearm in relation to a crime of violence. *Cf. Cassell*, 292 F.3d at 794–95 ("A prior history of intentionally possessing guns . . . is certainly relevant to the determination of whether a person . . . on the occasion under litigation knew what he was possessing and intended to do so.").

It was likewise not an abuse of discretion—much less grave abuse—for the lower court to hold exclusion

unwarranted under Rule 403.[12]  *See* FED. R. EVID. 403. Beyond the Phillips murder, considerable other evidence was presented showing Wilson's access and familiarity with firearms, including testimony that Wilson carried a gun; twice shot at James Faison, a rival gang member; and, in a separate incident, opened fire outside a recreation center.  This tends to reduce the danger of unfair prejudice from evidence of the Phillips murder—as that shooting "did not involve conduct any more sensational or disturbing than the [other]" conduct attributed to Wilson.  *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (D.C. Cir. 1990).  The relevancy of the Phillips shooting is also not rendered redundant, in light of other evidence of his familiarity with firearms; the shooting holds unique probative value because it arose during a drug transaction that "occurred relatively close in time to the conduct charged in the indictment, thereby increasing the probative value of the 404(b) evidence."  *United States v. West*, 22 F.3d 586, 597 (5th Cir. 1994).

---

[12] Rule 404's advisory committee note employs slightly different language in describing the balancing inquiry.  FED. R. EVID. 404 advisory committee's note ("The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors . . . under Rule 403.").  Contrary to Wilson's argument, Rule 403's ordinary "substantially outweighs" standard applies in weighing prejudice for evidence admitted under Rule 404(b).  *See, e.g.*, *Cassell*, 292 F.3d at 795  ("Our analysis does not end after determining that prior bad acts evidence is probative to a non-character issue under Rule 404(b). We must continue with a determination of whether the district court erred in determining that the evidence is admissible under Rule 403 . . . [which] prohibits the admission of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice . . . .").

19

Moreover, the district court issued limiting instructions to mitigate the danger of undue prejudice or improper inferences. There is nothing to suggest the jury ignored the court's instructions. *See United States v. Brown*, 597 F.3d 399, 406 (D.C. Cir. 2010) ("The jury is presumed to have followed [a] cautionary instruction."). Thus, "[w]here, as here, there is no compelling or unique evidence of prejudice, we deem such a limiting instruction sufficient to protect a defendant's interest in being free from undue prejudice . . . . ." *United States v. McCarson*, 527 F.3d 170, 174 (D.C. Cir. 2008).

**B**

The district court also admitted evidence of the Reid murder, finding it intrinsic to the charged conspiracy because it "show[ed] the way that the alleged conspiracies grew and were formed and developed, as well as evidence of prior conspiratorial conduct among the alleged conspirators that would be corroborative of the defendant's entry into the charged agreements in the indictment." J.A. 2132.

Generally intrinsic evidence includes "act[s] that [are] part of the charged offense" or "some uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). Thus, evidence is not generally rendered *intrinsic* simply because it completes the story or explains the circumstances behind a charged offense. *Id.* But even if evidence of the Reid murder was improperly admitted as intrinsic, any error was

harmless.[13] "In a conspiracy prosecution, the government is [] allowed considerable leeway in offering . . . [extrinsic, 'other crimes' evidence under Rule 404(b)(2)] to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed." *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000). It is well-established that such other crimes evidence is admissible to establish the "contours of [a] conspiracy." *United States v. Graham*, 83 F.3d 1466, 1473 (D.C. Cir. 1996).[14]

---

[13] We therefore need not resolve whether the Reid murder can be intrinsically admitted as prior conspiratorial conduct within the umbrella of the charged conspiracy—i.e., as an (uncharged) overt act in furtherance of the charged drug conspiracy or as contemporaneous action in facilitation of the conspiracy—based on the Government's theory that it was committed to "enrich certain members of the [conspiracy], as well as weaken another drug dealer." J.A. 656 (Government's Supplemental Notice & Motion to Admit Evidence of Other Crimes). *But see United States v. Watkins*, 591 F.3d 780, 785 (5th Cir. 2009); *United States v. Lewis*, 759 F.2d 1316, 1344 (8th Cir. 1985) ("[T]he government is not limited in its proof to establishing the overt acts specified in the indictment.").

[14] In the context of the Reid murder, Wilson's opening brief makes only fleeting reference to the Rule 403 standard, as part of its summary of a Third Circuit case. *See* Brief for Appellant David Wilson at 46. Because his Reid murder, Rule 403 argument is first made in his Reply, *see* Reply Brief for Appellant David Wilson at 20, the argument is waived, *see In re Asemani*, 455 F.3d 296, 300(D.C. Cir. 2006).

**IV**

Wilson next asserts *Brady* violations, which bear on his conviction for two counts of aiding and abetting murder. The Government's theory was that Wilson acted as the getaway driver for two gunmen in the murder of rival gang-member Ronnie Middleton and his girlfriend Sabrina Bradley. The Government argued Wilson assisted in the shootings because he believed Middleton was responsible for the murder of Maurice Doleman, who was "like a brother" to Wilson. *See* J.A. 2572 ("They was almost like brothers, sir."). Wilson points to the Government's failure to timely disclose various reports allegedly material to the murders and favorable to the accused. Our review is de novo. *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 892 (D.C. Cir. 1999).

Wilson first points to the Carter Report, which the Government disclosed roughly three months into trial. That police report contains a two-paragraph section reflecting Bradley Carter's statement that Aman Ball and Joseph Jones committed the murders, rather than Antonio Roberson and Antoine Draine—as the Government had theorized at trial. Second, Wilson argues the Doleman Reports were also improperly suppressed. Wilson obtained the Doleman Reports only in post-trial discovery. The reports consist of summaries of police interviews conducted during the investigation of the Doleman murder, including summaries of statements by three witnesses who indicated that they believed or had heard individuals other than Middleton were responsible for Doleman's death.

Wilson cannot show the delayed disclosure of the Carter Report was prejudicial. *See generally Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (the three components of a

*Brady* claim are (1) the evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, willfully or inadvertently; and (3) prejudice must have ensued). "[W]here disclosure was made but made late, the defendant must show a reasonable probability that an earlier disclosure would have changed the trial's result and not just that the evidence was material." *United States v. Andrews*, 532 F.3d 900, 907 (D.C. Cir. 2008). As the district court noted, the Carter Report "was disclosed approximately two months before the close of the government's case-in-chief, and Wilson had ample opportunity to use this evidence at trial." *United States v. Wilson*, 720 F. Supp. 2d 51, 70 (D.D.C. 2010). To the extent the Government's narrative as to the Middleton-Bradley murders was not fully challenged, it is because Wilson elected not to use the Carter Report to do so. *See id.* at 68 (Wilson did not recall the Government's witnesses, Kelliebrew or Capies, to incorporate information from the Carter Report into the defense's cross-examination or otherwise use the report to investigate facts and question witnesses).[15] Moreover, even if the Government's delay had prevented Wilson from using the Carter Report at trial (it did not), it is doubtful any prejudice would have ensued. The report does not even overtly contradict the Government's theory regarding Wilson's involvement in the Middleton-Bradley murders. Although the report implicates two different shooters, the Government

---

[15] Wilson's attorney, Wicks, also did not request a continuance to further investigate the new information. She instead asked for a delay in calling Carter, which the district court granted. J.A. 2992–93. *See Andrews*, 532 F.3d at 907 (no *Brady* violation based on the government's failure to produce notes until the fourth day of trial, where the notes were only six pages in length and the defense did not request a continuance to examine or investigate them despite having two opportunities to do so).

believed Wilson was the driver to and from the killings, not one of the shooters.

We also find no *Brady* violation based on suppression of the Doleman Reports. "Suppressed information is exculpatory and thus 'favorable' to the defense for *Brady* purposes when it directly contradicts the motive theory testified to by prosecution witnesses." *Mendez v. Artuz*, 303 F.3d 411, 414 (2d Cir. 2002). The Government theorized *Wilson* believed Middleton was responsible for Doleman's death, and this belief precipitated Wilson's involvement in the Middleton-Bradley murders. The suppressed reports, however, merely demonstrate that *other* individuals believed someone other than Middleton was responsible—which is, at best, tertiary to the question of Wilson's subjective beliefs and does not directly contradict the Government's theory of motive. *Cf. Hunt v. Lee*, 291 F.3d 284, 295 (4th Cir. 2002) ("[T]he state's theory [was] that Hunt killed Jones because Hunt *believed* that Jones . . . t[old] [the police] that Hunt killed Ransom. It is irrelevant whether Jones [] actually told the police that Hunt was Ransom's killer. The critical issue is whether Hunt believed that Jones was telling the police that Hunt was the killer."). Further, Wilson cannot show the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). "The police reports do not directly exonerate Wilson or lessen the force of the corroborated and credible testimony regarding admissions Wilson made about his involvement in the[] [Middleton-Bradley] murders to [various witnesses]." *Wilson*, 720 F. Supp. 2d at 65.[16]

---

[16] Wilson's co-conspirators Bobby Capies and Kairi Kelliebrew testified that Wilson told them of his involvement in the Middleton-

Even considering the cumulative effect of the multiple alleged *Brady* violations, *United States v. Lloyd,* 71 F.3d 408, 412 (D.C. Cir. 1995), the untimely or suppressed materials are insufficient to undermine our confidence in the jury's verdict or to overcome the Government's evidence, which included, *inter alia*, testimony from multiple witnesses that Wilson told them of his involvement in the Middleton-Bradley murders.

**V**

We turn to the Defendants' sentencing challenges. Both Wilson and Bell were convicted of multiple counts of crack distribution. They argue the sentences imposed by the district court violated the Sixth Amendment and were procedurally and substantively unreasonable. As the Defendants concede, our prior decision in *Jones*, 744 F.3d 1362, directly forecloses these sentencing arguments—save one claim related to a two-point firearm enhancement applied to Bell. *See* Oral Arg. Tr. at 1:08:42–09:53 ("We understand that this panel cannot reverse the holding in *Jones*. We think it was wrongly decided. . . . We would just ask that you would agree that we should have rehearing . . . .").[17]

---

Bradley murders. Torran Scott, who had a daughter with Bradley, also testified that Wilson told him "he didn't know that [Bradley] was in the truck." J.A. 3320. Renee Cottingham, who unlike the other three witnesses was not testifying pursuant to a deal with the Government, testified that Wilson provided her with specific details about the crime and that she observed Wilson repeatedly mumbling to himself, "Why was she there? Why was she there? She shouldn't have been there." J.A. 3339.

[17] This Court's prior decisions "bind the circuit unless and until overturned by the court en banc or by Higher Authority." *Critical*

**A**

In determining the Defendants' sentences, the district court attributed 1.5 kilograms of crack cocaine from the conspiracy to each of the Defendants as relevant conduct, a finding the court made by a preponderance of the evidence. Because the jury acquitted the Defendants of the charged drug conspiracies, the Defendants argue the district court's attributions violated the Sixth Amendment by increasing the minimum and maximum terms of imprisonment based on facts not found by a jury beyond a reasonable doubt.

The Sixth Amendment provides criminal defendants with the right to a jury trial. "The right includes, . . . as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.'" *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). Acting in conjunction with the Sixth Amendment is the protection of the Fifth Amendment, which requires a jury "to find each element of [a] crime beyond a reasonable doubt," *Patterson v. New York*, 432 U.S. 197, 204 (1977), before a guilty verdict can properly be rendered, *United States v. Gaudin*, 515 U.S. 506, 509–10 (1995).

That said, many facts that result in an increase to a defendant's sentence are not considered elements of a crime and can be found by a sentencing judge relying on a preponderance of the evidence standard. *Rita v. United States*, 551 U.S. 338, 352 (2007) ("[A] sentencing court [may] take account of factual matters not determined by a jury [] to

---

*Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (internal quotation marks omitted).

increase the sentence in consequence."). The scope of this general sentencing principle is, of course, not unlimited. Facts that increase the maximum, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), or mandatory minimum, *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), statutory sentence are considered elements that must be found by a jury beyond a reasonable doubt. Nonetheless "long-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction" or increase the statutory mandatory minimum. *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008).

The Defendants' sentences fall within the statutory range, rendering their constitutional argument unconvincing. They first suggest the sentencing court ran afoul of *Alleyne* by using the 1.5 kilograms of crack cocaine from the conspiracy to sentence the Defendants pursuant to 21 U.S.C. § 841(b)(1)(A), which includes a higher mandatory minimum sentence than subsections (B) or (C). *See* 21 U.S.C. § 841(b)(1)(A)–(C) (subsection (A) provides for a ten year mandatory minimum, as opposed to five years for subsection (B) and no mandatory minimum for subsection (C)). But "there is no indication in the record that the district court judge thought he had to impose a higher mandatory minimum sentence as a result of finding [the Defendants] responsible for a larger amount of cocaine." *United States v. Hernandez*, 731 F.3d 666, 672 (7th Cir. 2013). The filed judgments make clear the Defendants were sentenced pursuant to subsections (B) and (C). *See* J.A. 1812, 2113–14. *See also* J.A. 3664, 3702 (sentencing judge identifying the appropriate sentencing

ranges, rather than the ranges that would be produced if he had sentenced the Defendants pursuant to subsection (A)).

Even if the sentences fall within the statutory range, the Defendants argue *Alleyne* prohibits any increase in the defendant's base offense level or upward departure from the base offense level, where such an increase or departure is based on facts found by a sentencing judge to a preponderance of the evidence. *Alleyne*, however, dealt with an increase to the statutory range—not increases to a defendant's range under the Sentencing Guidelines ("Guidelines"). *See Alleyne*, 133 S. Ct. at 2161 n.2 ("Juries must find any facts that increase [] the *statutory* maximum or minimum . . . . Importantly, this is distinct from factfinding used to guide judicial discretion in selecting a punishment within limits fixed by law.") (emphasis added) (internal quotation marks and citations omitted). "We [] lack any basis to reconsider the settled rule that enhancing a sentence within the statutory range based on facts found by the judge, as opposed to the jury, does not violate the Sixth Amendment." *Jones*, 744 F.3d at 1369. "[J]udicial fact-finding does 'not implicate the Sixth Amendment even if it yield[s] a sentence above that based on a plea or verdict alone.'" *Id.* at 1370 (quoting *United States v. Bras*, 483 F.3d 103, 107 (D.C. Cir. 2007)).

**B**

The Defendants next challenge their sentences as procedurally unreasonable. Among other things, they protest the district court's consideration of 1.5 kilograms of crack cocaine from the acquitted conspiracy when calculating the Defendants' sentences. They argue crack cocaine distributed through the acquitted conspiracy is not "relevant conduct" where the Defendants' convictions were for "street-level drug

dealing." Brief for Joint Appellants Sentencing at 23, United States v. Bell, No. 08-3037 (June 30, 2014). *See generally* U.S.S.G. § 1B1.3(a) (relevant conduct). Yet in *Jones* we affirmed drug distribution sentences imposed on three of the Defendants' co-conspirators, where the sentencing judge attributed cocaine distributed through the course of the acquitted conspiracy. 744 F.3d at 1368 ("'[R]elevant conduct' includes acts that were part of the same course of conduct or common scheme or plan as the offense of conviction, and here, the district court specifically found that appellants' crack distribution offenses were part of a 'common scheme' with Congress Park Crew members, a finding that we have already determined was not clearly erroneous.") (internal quotation marks and citations omitted).[18]

Relying on Justice Scalia's partial concurrence in *Rita*, 551 U.S. at 375 (Scalia, J., concurring in part), the Defendants next rehash their Sixth Amendment argument couched as a distinct theory of procedural unreasonableness. They argue the sentencing court misunderstood the scope of his sentencing authority and misapplied the Guidelines. The Defendants' refrain is familiar: because the acquitted conspiracy was not found by a jury beyond a reasonable doubt, it was procedurally unreasonable for the sentencing judge to consider it in calculating the Defendants' base

---

[18] The Defendants also raise an argument that there was insufficient evidence to support an attribution of 1.5 kilograms of crack cocaine. The specifics of their contentions are somewhat better developed in a parallel argument they raise for substantive unreasonableness, discussed *infra* Part V(C). To the extent this procedural unreasonableness argument is distinct from the Defendants' substantive unreasonableness argument, it remains irreconcilable with *Jones*. *See* 744 F.3d at 1366–68.

offense levels under the Guidelines. According to the Defendants, the acquitted conspiracy could, at most, only be considered as a section 3553 factor. "Whatever the merits of Justice Scalia's argument [in *Rita*], it is not the law." *Jones*, 744 F.3d at 1369. A sentencing court may base a sentence on acquitted conduct, "even when consideration of the acquitted conduct multiplies a defendant's sentence severalfold," so long as the sentence does not exceed the statutory maximum and is based on conduct established by a preponderance of the evidence. *Id.*

The Defendants' final argument for procedural unreasonableness relates to a two-point firearm enhancement imposed on Bell. *See* U.S.S.G. § 2D1.1(b)(1). The enhancement was imposed based on a loaded handgun found hidden in Bell's bedroom in proximity to other tools of the narcotic trade. The search leading to the firearm occurred in 1996, during the lifetime of the acquitted crack conspiracy, but Bell argues the enhancement can only be applied if a firearm was present during an offense of conviction—i.e., if the firearm was found during one of the drug distribution counts of which he was convicted. Bell is mistaken. "The applicability of a specific offense characteristic, such as section 2D1.1(b)(1), depends on whether the conduct at issue is 'relevant' to the offense of conviction," *United States v. Pellegrini*, 929 F.2d 55, 56 (2d Cir. 1991). "[T]he enhancement is to be applied whenever a firearm is possessed during conduct relevant to the offense of conviction," *United States v. Smith*, 127 F.3d 1388, 1390 (11th Cir. 1997), which "includes acts 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *Id.* (quoting U.S.S.G. § 1B1.3(a)(2)). It was not erroneous for the sentencing judge to find the firearm was possessed during conduct *relevant* to the offenses of conviction. The weapon was found "hidden in a speaker . . . in proximity to other tools

of the narcotic trade," J.A. 2627–28, and the judge found—by a preponderance—that the life of the drug conspiracy encompassed both the time of the search and the time of the offenses of conviction.

## C

The Defendants also contend their sentences were substantively unreasonable, though—at times—their arguments are mere variations of their constitutional or procedural unreasonableness theories. For example, the Defendants again argue the sentencing judge could not attribute crack cocaine from the acquitted conspiracy to them, as relevant conduct. This particular iteration of the Defendants' argument hinges on their belief that "[t]he only reasonable interpretation of the [jury's acquittal on conspiracy] is that [the jury] believed either no conspiracy existed or that Appellants were not part of the conspiracy." Brief for Joint Appellants Sentencing at 28.[19] But "an acquittal in a criminal case does not preclude the Government

---

[19] The Defendants assert this conclusion necessarily follows because the jury purportedly made specific factual findings as to the drug quantities attributable to Bell and Wilson as co-conspirators, by acquitting them of conspiring to distribute at least 5 kilograms of cocaine and 50 grams of crack cocaine, as well as the lesser included offenses of conspiracy to distribute 500 grams of cocaine and 50 grams of crack cocaine and conspiracy to distribute detectable amounts of cocaine and crack cocaine. Yet "[a]n acquittal [is] only [] an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt." *United States v. Watts*, 519 U.S. 148, 156 (1997). It does not amount to a specific finding that no conspiracy existed or that the Government would be unable to prove the Defendants' participation in the conspiracy under a reduced burden of proof.

from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof. . . . [A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 156 (1997).

The Defendants also argue it was substantively unreasonable to attribute the distribution of 1.5 kilograms of crack cocaine to them. The Defendants argue there was insufficient evidence to support the quantities of crack cocaine attributed by the judge, based on the evidence presented of the quantities that Bell and Wilson personally distributed. The sentencing judge's attribution, however, was—in the first instance—based upon whether crack cocaine sales among *all the conspirators* exceeded 1.5 kilograms and were reasonably foreseeable to the Defendants. J.A. 3623–24 (Bell),[20] 3687–88 (Wilson). *See also Jones*, 744 F.3d at 1368 (permitting the attribution of crack cocaine from defendants' coconspirators as relevant conduct); U.S.S.G. § 1B1.3(a)(1)(B) & cmt. 2 (conduct of coconspirators is "relevant" in determining a defendant's Guideline range where he engages in jointly undertaken criminal activity and the coconspirators' conduct is reasonably foreseeable to the defendant). This finding was supported by ample evidence. *See, e.g.*, J.A. 3621–24 (as to Bell, noting—in addition to various other witness testimony—that the co-conspirators who entered guilty pleas admitted to their accountability for

---

[20] The sentencing judge made a secondary finding that Bell was personally responsible for at least 1.5 kilograms of crack cocaine. J.A. 3623. This finding was also adequately supported. *See* J.A. 3622–23.

over 1.5 kilograms of crack cocaine); J.A. 3689–91 (same, as to Wilson).

The Defendants further protest that the Government relied upon testimonial evidence, rather than physical or documentary evidence. But there is no problem with the Government relying on admissible testimony, so long as it is sufficient—either alone or in combination with other evidence—to satisfy the requisite burden of proof. *See United States v. Graham*, 317 F.3d 262, 271 (D.C. Cir. 2003). Moreover, contrary to the Defendants' claims of vagueness and inconsistency, the Government's witnesses offered specific information to support the quantities of cocaine attributed to the Defendants based on the acquitted conspiracy. Drug dealer Cedric "Conner . . . [testified to] supplying an estimated quantity in excess of one kilo between 1999 and 2000, and [coconspirator Robert] Capies . . . [admitted to] buying over 500 grams from 1992 to 2001." J.A. 3622. The Defendants challenge the credibility of these witnesses. But, while evidence of their coconspirators' disreputable character "may undercut the[ir] . . . credibility generally, [it] do[es] not establish that it was implausible for the district court to credit particular aspects of their testimony, especially where, as here, the cooperators offered mutually corroborative accounts." 744 F.3d at 1367.

## VI

For the foregoing reasons the district court is

*Affirmed.*

WILKINS, *Circuit Judge*, dissenting in part and concurring in part:  I join the Court's opinion upholding Bell's sentence.  I part ways with the majority, however, on Wilson's conviction.  In my view, the District Court violated the Fifth and Sixth Amendments by forcing Wilson to continue his defense with replacement counsel who had been absent from court during the earlier testimony of key government witnesses.  Because this error requires reversing Wilson's conviction and remanding his case for a new trial, I respectfully dissent.

## I.

The Supreme Court decided *United States v. Cronic*, 466 U.S. 648 (1984) and *Strickland v. Washington*, 466 U.S. 668 (1984) on the same day.  In doing so, the Court examined the Sixth Amendment right to the effective assistance of counsel with respect to two very distinct categories of asserted error.  Understanding the reasons for the separate paths is fundamental to the analysis of the error asserted in this case.

In the first category of constitutional error, the defense lawyer "deprive[s] a defendant of the right to effective assistance, simply by failing to render 'adequate legal assistance.'"  *Strickland*, 466 U.S. at 686 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)).  "[B]ecause we presume that the lawyer is competent to provide the guiding hand that the defendant needs, the burden rests on the accused to demonstrate a constitutional violation."  *Cronic*, 466 U.S. at 658 (citation omitted); *see also Strickland*, 466 U.S. at 688 (discussing "presumption that counsel will fulfill the role in the adversary process that the Amendment envisions").  To prevail on this type of claim, the defendant must show that counsel's performance was objectively unreasonable, and that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 687-88, 694.  Thus, the analysis hinges on an examination

of "how specific errors of counsel undermined the reliability of the finding of guilt." *Cronic*, 466 U.S. at 659 n.26 (citing *Strickland*, 466 U.S. at 693-96).

The second category of Sixth Amendment error does not examine specific errors of counsel at all. Rather, this error transpires when "[t]here are . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658. In these instances, the constitutional violation is shown "without inquiry into counsel's actual performance at trial," *id*. at 662, because "the surrounding circumstances made it so unlikely that *any* lawyer could provide effective assistance that ineffectiveness [i]s properly presumed without inquiry into actual performance at trial," *id*. at 661 (emphasis added). Stated differently, the circumstances of this type of error are such that "although counsel [was] available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id*. at 659-60.

So how do we identify those circumstances "that are so likely to prejudice the accused" that prejudice is presumed? The Supreme Court provided several salient examples in both *Strickland* and *Cronic*.

In *Strickland*, the Court observed that prejudice is presumed where there is an "[a]ctual or constructive denial of the assistance of counsel altogether." 466 U.S. at 692. *Cronic* agreed, explaining that prejudice is presumed where a defendant was "denied counsel at a critical stage of his trial," whether actually or constructively. 466 U.S. at 659. The Court also explained that, when counsel "entirely fails to subject the prosecution's case to meaningful adversarial

testing," the adversary process is presumptively unreliable. *Id.*

But in addition to these scenarios, *Strickland* explained that prejudice is presumed where there have been "various kinds of state interference with counsel's assistance," 466 U.S. at 692, because the "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense," *id.* at 686. Again, *Cronic* agreed, explaining that prejudice is presumed where the defense was "prevented from assisting the accused during a critical stage of the proceeding." 466 U.S. at 659 n.25. In so doing, both *Strickland* and *Cronic* reaffirmed the long-established principle that certain impediments to the defense are so grave that they thwart the adversarial factfinding process at the heart of our system of justice. These impediments can result from actions of the trial court as well as those of the prosecutor. When a trial court imposes serious obstacles to a defendant's ability to obtain the "guiding hand of counsel at every step in the proceedings against him," due process is denied. *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (quoting *Powell v. Alabama,* 287 U.S. 45, 69 (1932)). This is because "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975).

In this case, forcing Wilson to finish the trial with a lawyer who had missed several critical days of the proceedings was such an impediment to the defense and interference with counsel's assistance that prejudice is presumed. To understand why, we need to review the facts.

4

## II.

As the majority explains, Wilson was one of six defendants in a drug conspiracy trial that lasted ten months. Four months into the government's case, Wilson's lead counsel, Jenifer Wicks, suddenly took ill, and the District Court initially announced its intent to grant Wilson's motion for a mistrial. However, the Government objected, and the District Court changed course. The Government proposed that Wilson's second-chair counsel, Gary Proctor, be elevated to take over his defense, and that the court could take a continuance to allow Proctor to get up to speed. The District Court acceded to this request and denied Wilson's motion for a mistrial.[1]

---

[1] The District Court refused to grant a mistrial solely on the ground that appointing Proctor as replacement counsel, appointing a new second-chair counsel, and recessing for sufficient time to allow Wilson's new defense team to prepare would be sufficient to protect Wilson's rights. Trial Tr. at 16,635-37, United States v. Ball (D.D.C. June 27, 2007), ECF No. 1040. The District Court's determination therefore implicitly declined the government's self-serving invitation to speculate that Wicks would be "available in some capacity" to consult with Proctor. *Id.* at 16,599. Thus, the majority's suggestion (based on the biased speculation by the trial prosecutor) that Wicks might have been able to assist Wilson from outside the courtroom after a two-week initial recovery – a proposition for which there is no support – is wholly irrelevant to the decision under review. Of course, it also ignores the fact that the initial two weeks during which Wicks was undisputedly forbidden from discussing work on doctor's orders ended July 9, the day the government resumed its case following a recess. Proctor therefore could not have consulted with Wicks as of the time he had to begin defending the remainder of the government's case.

Saying that Proctor needed to get up to speed is quite the understatement. Proctor had tried only one other federal criminal case (also as second-chair counsel), had no familiarity with the RICO statute, and had only been admitted to the bar for about five years. Defendant's June 24, 2007 Trial Brief, United States v. Ball, No. 05-cr-100 (D.D.C. June 24, 2007), ECF No. 1016. He joined Wilson's defense only a week and a half before trial began, and continued to work on other cases during the first four months of trial. His role on Wilson's defense was largely administrative; Wicks prepared the trial strategy, interviewed witnesses, and consulted with Wilson while Proctor made photocopies and handled phone calls. Proctor cross-examined only one government witness and met with Wilson independently only once before Wicks took ill. Proctor was thus not merely second-chair counsel; he was a part-time, relatively inexperienced, last-minute addition second-chair counsel.

Because of his administrative duties in this case, as well as his work on his other cases, Proctor was not present in court for about a third of trial before Wicks's illness. Proctor missed the testimony of several witnesses who were critical to the prosecution's case against Wilson, including Torran Scott and Renee Cottingham, two of the four witnesses who inculpated Wilson in the murders of Sabrina Bradley and Ronnie Middleton. *See* Trial Tr. at 11, United States v. Ball, No. 05-cr-100 (D.D.C. June 27, 2007), ECF No. 1040. Proctor was not in the courtroom to watch Scott tell the jury that Wilson had admitted involvement in the shooting, and that Wilson asked Scott to corroborate his alibi. Nor did Proctor see Scott admit on cross examination that he failed to inculpate Wilson until four years after the murders and two days before pleading guilty as part of a deal with the government. Proctor was not present when Cottingham told the jury that Wilson confessed to her that he had committed

the murders while she unbraided his hair one evening. Proctor did not see Wicks cross-examine Cottingham on her belief that Wilson was involved in her brother's homicide, giving her strong incentive to implicate him in Middleton and Bradley's murders. Scott and Cottingham's testimony, along with the testimony of two co-conspirators who testified in exchange for government leniency, was the only evidence the government presented to connect Wilson with those murders. *See* Maj. Op. at 23 n.16.

Proctor missed other significant parts of the prosecution case as well. Proctor was not present during a large part of the cross-examination of Damien Green. Green was a government witness who had testified at length that Wilson had robbed several men at gunpoint, threatened him with a gun, shot at him, and even shot up a recreation center. *See* Trial Tr. at 11,675-77, United States v. Ball, No. 05-cr-100 (May 17, 2007), ECF No. 942; Trial Tr. at 13,106-12, *id.* (D.D.C. May 29, 2007), ECF No. 967; Trial Tr. at 13,786-88, 13,827-35, *id.* (D.D.C. May 31, 2007), ECF No. 978. On cross, when Proctor was absent, other defense attorneys questioned Green about his daily use of drugs and alcohol throughout the period about which he had testified. Trial Tr. at 13,913-22, *id.* (D.D.C. June 4, 2007), ECF No. 979. Proctor was also absent during – and did not see the jury's reaction to – a forensic pathologist's graphic testimony about Middleton and Bradley's deaths, during which the government introduced into evidence autopsy photographs of their gunshot wounds and their faces. Trial Tr. at 15,629-34, 15,645-69, *id.* (D.D.C. June 14, 2007), ECF No. 1010, 1012.

When Wicks left Wilson's side, her accumulated knowledge of the case left with her. In particular, Wilson lost: (1) Wicks's tactical and strategic consultations with Wilson about the trial, (2) Wicks's appraisal of witness

demeanor, and (3) Wicks's assessment of the jury's reaction to the witness testimony and physical evidence introduced at trial. In denying Wilson a mistrial and forcing him to continue to verdict with the assistance of a lawyer who had missed so much and who would not have this accumulated knowledge, the District Court deprived Wilson of his right to an attorney with the knowledge necessary to challenge adequately the government's evidence.

**A.**

The District Court did not consider the impact on Wilson's defense of losing Wicks's work-product from her consultations with Wilson, but Supreme Court precedent makes clear the centrality of these consultations to the right to assistance of counsel. Moreover, when a defendant is denied the opportunity to consult with counsel at trial, prejudice to the defense is presumed. In a series of cases reaffirmed in *Cronic*, 466 U.S. at 659 n.25, the Supreme Court found constitutional error based upon limitations on criminal defendants' ability to consult with their attorneys. In *Geders v. United States*, the Court held that a trial court's denial of the defendant's access to his attorney during a weekend trial recess violated the right of effective assistance of counsel, because it hampered counsel's ability to discuss the significance of the day's evidence with the defendant. 425 U.S. 80, 88-89 (1976); *see also Mudd v. United States*, 798 F.2d 1509, 1510 (D.C. Cir. 1986) (holding that even an order only barring the defendant from discussing his upcoming testimony with his counsel – but not restricting any other topic of discussion – during a trial recess violates the Sixth Amendment and requires reversal without a showing of actual prejudice). Similarly, in *Brooks*, the Court struck down a Tennessee law that required a defendant to take the stand before any other defense witnesses, because it inhibited the

"important tactical decision" of whether and when the defendant would testify.  406 U.S. at 612.  In short, "the Sixth Amendment guarantees not just the right to have counsel, but also the right to consult with counsel about important tactical decisions," to participate in those decisions, and to have one's counsel "obtain factual information crucial to making them." *United States v. McLaughlin*, 164 F.3d 1, 17 (D.C. Cir. 1998) (Tatel, J., dissenting).

After *Cronic*, the Court confirmed that a trial court's denial of the defendant's right to confer with his attorney during trial recess "is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective."  *Perry v. Leeke*, 488 U.S. 272, 280 (1989).  As this Court explained in *Mudd*, 798 F.2d at 1513, a rule that requires the defendant to establish that he was prejudiced by his inability to consult with counsel would require the defendant to show "what he and counsel discussed, what they were prevented from discussing, and how the order altered the preparation of his defense," and "[p]resumably the government would then be free to question defendant and counsel about the discussion that *did* take place, to see if defendant nevertheless received adequate assistance."  *Mudd*, 798 F.2d at 1513.  We stated then that we could not "accept a rule whereby private discussions between counsel and client could be exposed in order to let the government show that the accused's sixth amendment rights were not violated," chilling defendants' ability to communicate freely with their lawyers. *Id.* (citing *Martin v. Lauer,* 686 F.2d 24, 32 (D.C. Cir. 1982)).

Proctor represented, and the government did not dispute, that while he was out of court attending to his other cases, making copies and performing other administrative tasks (and at one point even travelling to Ireland for a family funeral),

Wicks was in the courtroom every day discussing the government's evidence with Wilson and strategizing his defense. The District Court corroborated Wilson's lack of a relationship with Proctor before Proctor was forced to take over, urging Wilson to "take to heart" the need to communicate with Proctor going forward. Trial Tr. at 16,639, United States v. Ball (D.D.C. June 27, 2007), ECF No. 1040. Had Wicks remained until the end of trial, her consultations with Wilson undoubtedly would have guided her choices about how to challenge later government witnesses, what further investigation was needed, what witnesses to call in her case-in-chief, and what to ask those witnesses. Proctor did not observe much of the vital attorney-client consultation that happens during trial while testimony is fresh, and it is completely unrealistic to assume that he could reconstruct those discussions months later based on a cold transcript. Since Wicks was forbidden from any work for the fortnight following her illness, it is beyond dispute that Proctor lacked any access to these consultations in the two weeks he prepared for the close of the government's evidence. As for the remainder of trial, the record contains no evidence indicating anything other than that most, if not all, of these consultations between Wilson and Wicks were irretrievably lost to Proctor.

In reversing its prior decision to sever Wilson from the trial, the District Court gave no consideration to the prospect that moving forward would mean the loss of months' worth of Wilson's consultations with Wicks. *See id.* at 16,636-39. But the Constitution protects the defendant's ability to consult with counsel during trial because "ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance." *Geders*, 425 U.S. at 88. Criminal defendants know the most about the facts of their own case, but are typically not familiar with the rules of

evidence and lack the skill to present their own defense. *Powell*, 287 U.S. at 68-69. Defense counsel must have access to the information needed to challenge the government's case. The same constitutional error that flows from a restriction on defendant-counsel communication also results from a court order to continue trial after the knowledge and strategic decisions built upon these communications are lost to the defense. Forcing Wilson to move forward when the substance of his consultations with counsel had been erased fundamentally impaired the adversarial process. Spoliation of the fruits of consultation is no different from denial of consultation in the first place. Based on *Geders*, *Perry v. Leake*, and *Mudd*, prejudice from such spoliation is presumed.

**B.**

The loss of Wicks's appraisal of witness demeanor is a separate highly prejudicial circumstance, because it impaired Wilson's right to present a defense, including the right to challenge the credibility of government witnesses. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). The government conceded at oral argument that witness credibility is a critically important issue to trial success, Oral Arg. Tr. at 21:27-21:38, and that observing live testimony enhances credibility determinations beyond what is possible from merely reading a transcript, *id.* at 22:04-22:10. We afford trial judges the greatest deference in their role as factfinders precisely because only those who observe witness testimony firsthand "can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (internal citations omitted); *see also, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 701 (1996) (Scalia, J., dissenting) (probable cause findings are reviewed deferentially because "[a]n appellate

court never has the . . . full benefit of [the district court's] hearing of the live testimony."); *Wainwright v. Witt*, 469 U.S. 412, 429 (1985) (a trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record"). It can hardly be gainsaid that "[l]ive testimony enables the finder of fact to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice – matters that cannot be gleaned from a written transcript." *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) (internal citations omitted).

Even more importantly, the Sixth Amendment *requires* that the factfinder observe witness examination first-hand. The Confrontation Clause "commands . . . that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination," *Crawford v. Washington*, 541 U.S. 36, 61 (2004), and entitles a criminal defendant to "both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness," *Barber v. Page*, 390 U.S. 719, 725 (1968).  As Judge Learned Hand explained, witness demeanor may prove decisive to the jury's resolution of a case:

> [T]he carriage, behavior, bearing, manner and appearance of a witness – in short, his "demeanor" – is a part of the evidence.  The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are.  They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness.  This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis

that this part of the evidence may have turned the scale. Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.

*Dyer v. MacDougall*, 201 F.2d 265, 268-69 (2d Cir. 1952) (footnote omitted).

But unlike other forms of evidence, "[d]emeanor evidence is not captured by the transcript; when the witness steps down, it is gone forever." *United States v. Zeigler*, 994 F.2d 845, 849 (D.C. Cir. 1993). Just as it is undoubtedly true that, "since [witness demeanor] evidence has disappeared, it will be impossible for an appellate court to say" whether the factfinder was correct in relying on it, *Dyer,* 201 F.2d at 269, any advocate hoping to challenge witness credibility based on demeanor will be fundamentally handicapped if he did not himself observe the witness testify. Since witness demeanor may determine the jury's verdict, an attorney must observe the testimony in order to mount an effective defense.

When the District Court forced Proctor to take over Wilson's defense without having seen key government witness testimony, it denied him the means to prepare his client's defense. It is folly to expect an attorney who was not present at trial to "pick up the thread of the state's case, pick up on all the subtle nuances that are apparent only to those actually in the courtroom during trial, read a cold transcript . . . and go on to do an effective job on a criminal case." *Minnesota v. Parson*, 457 N.W.2d 261, 263 (Minn. Ct. App. 1990) (holding that trial court erred in allowing pro se

defendant's standby counsel to leave courtroom during trial after defendant refused his assistance). Few lawyers would voluntarily enter into such a disadvantaged position. Indeed, Proctor's motion for a mistrial explicitly cited his fear of violating his ethical duty to competently represent Wilson. How can we uphold a conviction secured after such a fatal blow to the defense's ability to challenge the government's case?

**C.**

Wilson was further prejudiced because his lawyer missed the reaction of the most important people – the factfinders – to critical portions of the evidence. In *Herring*, a case favorably cited by both *Cronic* and *Strickland*, the Court ruled that the Sixth Amendment was violated because the defendant's lawyer was not permitted to make a summation in a bench trial. 422 U.S. at 864. No prejudice needed be shown. And it was immaterial that the trial judge – the factfinder – said that he did not need to hear from the lawyer to decide the credibility issues because "counsel's argument would not change his mind." *Id*. at 860. The Court described the case as involving the right "to participate fully and fairly in the adversary fact-finding process," *id*. at 858, because "there will be cases where closing argument may correct a premature misjudgment and avoid an otherwise erroneous verdict," *id*. at 863.

Any good trial lawyer knows to watch the jury's reaction to testimony as it is presented, because jurors' responses can inform strategic and tactical choices going forward. *See* HON. RICHARD B. KLEIN, ROBERTO ARON, TRIAL COMMUNICATION SKILLS § 46:4 (2d ed. 2014) ("During a court presentation one should observe the jury's response. . . . Not observing the jury's reaction is like walking down the street with your eyes

closed."); Richard M. Rawdon, *Listening: The Art of Advocacy*, 36 TRIAL 99, 101 (2000) ("By noting jurors' reactions, you can alter your proof if necessary. . . . When you conduct your cross, . . . you must observe the jury's reaction to your questions and the witness's answers."); Hon. Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 HASTINGS L.J. 1381, 1406 (1996). In recognition of the fact that jurors' reaction to testimony is often key to understanding the ultimate verdict, appellate courts defer to trial judges' rulings that are informed by observation of those responses. *E.g.*, *Palenkas v. Beaumont Hosp.*, 443 N.W.2d 354, 356-57 (Mich. 1989) (determination of whether jury's verdict was "motivated by such impermissible considerations as passion, bias, or anger is best left to trial court because it observed jury reaction to witnesses); *Pennsylvania v. Fredericks*, 340 A.2d 498, 504 (Pa. Super. Ct. 1975) (upholding declaration of mistrial because trial court was in a "far better position" to weigh whether jury would reach a verdict since it had "observed the jury's attentiveness and reaction to the evidence"); *Redevelopment Auth. of Bucks Cnty. v. Asta*, A.2d 300, 303 (Pa. Commw. Ct. 1974). Perhaps the Eight Circuit summed it up best in explaining why it deferred to a trial judge's determination that a jury's damage award was the result of passion or prejudice:

> [W]e acknowledge that much of the evidence supporting this inference consisted of the district court's observations of the jury's general demeanor, observations that do not necessarily lend themselves to written expression. In other words, perhaps one just had to be there.

*Tedder v. Am. Railcar Indus., Inc.*, 739 F.3d 1104, 1112 (8th Cir. 2014).

Wilson was denied an attorney who "had been there" to observe the jury's reaction to critical testimony that inculpated his client in a double homicide. He was consequently denied a lawyer capable of adjusting his case and focusing his closing argument based on that jury reaction. In this case, the Sixth Amendment mandated that Wilson have an advocate who could effectively present an alternative view of the evidence, and "no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Herring*, 422 U.S. at 862. How could Wilson's counsel effectively "correct premature misjudgments" that the jurors may have reached about the evidence, when, for much of the case, he was not even present to see their initial judgments?

\* \* \*

As explained above, in *Cronic* and *Strickland* the Supreme Court identified three scenarios in which prejudice is presumed to result from the denial of the Sixth Amendment right to assistance of counsel. Several of the Supreme Court's post-*Cronic* cases have dealt with whether counsel's performance so "fail[ed] to subject the prosecution's case to meaningful adversarial testing" that prejudice need not be shown. *See Bell v. Cone*, 535 U.S. 685, 696-98 (2002) (prejudice not presumed where defense counsel failed to present mitigating evidence and waived closing argument in penalty phase of capital case but delivered opening statement, pointed to mitigating evidence already adduced at trial, and successfully objected to government evidence); *Smith v. Robbins*, 528 U.S. 259, 286-88 (2000) (prejudice not presumed where failure consisted of attorney's decision not to file a merits brief on direct appeal). Likewise, the Court has

examined what constitutes actual or constructive absence of counsel at a "critical stage," *Cronic*, 466 U.S. at 659, of the proceeding. *See Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (counsel's participation in plea hearing via telephone was not subject to prejudice *per se*); *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000) (counsel's failure to timely file appeal worked a complete denial of appellate counsel because it "deprived respondent of the appellate proceeding altogether"); *Penson v. Ohio*, 488 U.S. 75, 88 (1988) (denial of counsel on appeal is subject to presumed prejudice). But the Court has not had occasion to identify further examples of prejudice *per se* that fall under the final category it identified in *Cronic* and *Strickland*: the government or trial court's interference with counsel's assistance to his or her client.

Our sister circuits, following the Supreme Court's lead, have adopted rules that certain other impairments of access to counsel are *per se* prejudicial. For instance, the Second Circuit concluded that representation by a disbarred attorney is prejudicial *per se*. *United States v. Novak*, 903 F.2d 883, 890 (2d Cir. 1990). More relevant to the case at bar, a number of our sister circuits have held even brief physical absences of defense counsel from trial presumptively prejudicial. The Sixth Circuit, for instance, overturned a conviction obtained after a trial in which counsel was absent for an afternoon of testimony that directly inculpated the defendant, reasoning that "[i]t is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt." *Green v. Arn*, 809 F.2d 1257, 1263 (6th Cir. 1987), *vacated on other grounds*, 484 U.S. 806 (1987), *reinstated*, 839 F.2d 300 (6th Cir. 1988). The Fifth Circuit, in *United States v. Russell,* 205 F.3d 768 (5th Cir. 2000), reversed a conspiracy conviction even though the testimony focused on the co-defendants, rather than the defendant, during his counsel's day-long absence from court.

These cases differ from the instant one only in the physical presence of *some* lawyer at every stage of Wilson's trial. *But see Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001) (en banc) (overturning murder conviction after counsel, though present, repeatedly dozed during the defendant's trial). Physical presence is important, since without it there will be no one to object to prosecution evidence and confront the government's witnesses. But it is not the end of the inquiry. Assessing witness demeanor, consulting with the defendant, and observing the reaction of the jurors are as critical to a criminal defense as cross-examination, and it is those capacities, not the mere risk of "strategic blunders by the defense," Maj. Op. at 13, that are threatened by the majority's disposition. It is not enough that some defense lawyer be present to object when necessary; that lawyer must also have the knowledge necessary to carry forward the representation through the defense case-in-chief and closing argument. Nothing can substitute for observing and listening to live testimony, watching the jurors, and consulting with the defendant in preparing for cross-examination, shaping the evidence the defense will present during its case-in-chief, and structuring closing argument.

Neither the majority nor either party has found a case with facts analogous to this one. The best the majority can muster is *United States v. Griffiths*, 750 F.3d 237, 239 (2d Cir. 2014) (per curiam). But *Griffiths* is an apple to our orange. First, the case involved a two-week trial on a three count indictment for false statements, obstruction of justice and mail fraud; serious charges no doubt, but far from the bulk, complexity and seriousness of this case. Second, while replacement counsel was brought in to present closing arguments after the defense lawyer suffered a debilitating stroke at the close of the evidence, such counsel had the aid of the defense paralegal who had been present for the entire

trial.[2]  Finally, and most significantly, the defendant in *Griffiths* refused to consent to a mistrial, so this was not a case where the alleged trial impairment was due to actions of the government or the trial court, as it is here.[3]  In line with *Griffiths*, courts have declined to reverse midtrial substitutions of counsel only where the circumstances ensured that an incapacitated defense attorney's knowledge of the case would not be lost to replacement counsel.  *E.g.*, *United States v. Ortiz-Martinez*, 1 F.3d 662, 667 (8th Cir. 1993) (attorney who took ill was still present at trial to advise replacement

---

[2] As explained above, despite the majority's speculation that Wicks had "some capacity to accept telephone calls" after her hospitalization, Maj. Op. at 5, at the time the District Court denied the mistrial there was no reasonable expectation that she would be able to assist significantly in Wilson's defense.

[3] For that reason, any double jeopardy concern is a red herring on our facts.  Wilson himself moved for a mistrial, and the "general rule is that the defendant's motion for, or consent to, a mistrial removes any double jeopardy bar to reprosecution."  *Oregon v. Kennedy*, 456 U.S. 667, 683 (1982).  *See also* 2A CHARLES ALAN WRIGHT & PETER J. HENNING, FEDERAL PRACTICE AND PROCEDURE § 440 (4th ed. 2009).  But if the circumstance were to arise in the future where a defendant refused to consent to a mistrial after his lawyer's mid-trial incapacitation, I note that courts regularly conclude that the "lengthy delay" required for replacement counsel to prepare constitutes "manifest necessity" that justifies declaring a mistrial without a double jeopardy bar to retrial, even if the defendant objects to a mistrial.  *United States v. Williams*, 717 F.2d 473, 475 (9th Cir. 1983); *see also United States v. Tolliver*, 937 F.2d 1183, 1188 (7th Cir. 1991); *United States v. Von Spivey*, 895 F.2d 176, 178 (4th Cir. 1990); *Hudson v. Rushen*, 686 F.2d 826, 831 (9th Cir. 1982); *United States v. Wayman*, 510 F.2d 1020, 1028 (5th Cir. 1975).  I know of no case in which defense counsel's incapacitating illness was *not* found to constitute manifest necessity.

counsel); *United States v. Sonnenschein*, 565 F.2d 235, 235 (2d Cir. 1977) (new counsel had been prepared to try the case from the beginning of trial).

**III.**

The majority fears that presuming prejudice in Wilson's case would "sweep virtually every mid-trial substitution under *Cronic*'s blanket rule," Maj. Op. at 14, but the Court confuses analysis under *Cronic* with automatic reversal.  Just because all mid-trial substitutions where replacement counsel missed earlier parts of trial should be analyzed under *Cronic*'s rubric does not mean all substitutions violate the Sixth Amendment. *See Perry*, 488 U.S. at 279-81 (affirming that "direct governmental interference with the right to counsel" is prejudicial *per se*, but finding no constitutional error in order prohibiting defendant from conferring with his attorney during a fifteen-minute break in his testimony); *Mudd*, 798 F.2d at 1514 ("We thus do not find that *all* orders restricting the discussion of testimony constitute a violation, no matter what their duration;  . . . [w]hen these sixth amendment violations occur, however, we agree with those circuits that have applied a *per se* reversal rule.").  The Court need only hold that, when defense counsel is incapacitated mid-trial through no fault of the defendant, and no replacement attorney is available who observed the testimony of key government witnesses against the accused and participated in material consultations with the defendant, the Constitution requires a mistrial.

My colleagues reply that determining situations in which prejudice is presumed with such a degree of specificity would "replac[e] 'case-by-case litigation over prejudice with case-by-case litigation over prejudice per se.'"  Maj. Op. at 15 (quoting *Scarpa v. Dubois*, 38 F.3d 1, 14 (1st Cir. 1994)).

The First Circuit opinion the majority cites for this proposition arose in a completely different context: it dealt with an ineffective assistance claim based on defense counsel's trial error, which the defendant argued was so egregious that the court should presume prejudice. The *Scarpa* court explicitly cautioned that "*attorney error*, even when egregious, will almost always require analysis under *Strickland*'s prejudice prong." *Scarpa*, 38 F.3d at 14 (emphasis added). The Supreme Court later made precisely the same point, explaining that, when it comes to defense counsel performance, prejudice will *only* be presumed if counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," a distinction that "is not of degree but of kind." *Bell*, 535 U.S. at 697. As I explain above, however, an impediment to the defense affirmatively erected by the government's objection to a mistrial is wholly different from defense counsel blunder.

In addition, even on its own terms, *Scarpa* is unconvincing. The First Circuit reasoned that it was inappropriate to presume prejudice when the court must examine the trial record to detect whether the error occurred. *Scarpa*, 38 F.3d at 14 ("[O]nce it is necessary to examine the trial record in order to evaluate counsel's particular errors, resort to a *per se* presumption is no longer justified by the wish to avoid the cost of case-by-case litigation."). Yet reviewing the trial record is precisely what must be done even in cases where the application of prejudice *per se* is unchallenged. *See, e.g.*, *Green*, 809 F.2d at 1260-61 (analyzing large portions of trial transcript to determine that counsel was absent during government witness testimony that inculpated the defendant). And, contrary to the majority's exhortation not to frame the circumstances in which the Court should presume prejudice too narrowly, the Supreme Court has admonished us to define these situations with some

specificity. *See Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) (framing question as applicability of *Cronic* rule to counsel's absence during "testimony regarding codefendants' actions"); *Wright*, 552 U.S. at 125 ("Our precedents do not clearly hold that counsel's participation by speakerphone should be treated as a 'complete denial of counsel,' on par with total absence.").

Presumptive prejudice as described by *Strickland* and *Cronic* is not an historical curio, kept in the reliquary cabinet to be taken out and marveled at but never employed in future cases, no matter how much they fit its pattern. Surely, if there are cases in which prejudice should be presumed, this is one. Wilson was convicted of Middleton and Bradley's murders *solely* based on the testimony of witnesses who claimed that he had confessed his involvement to them; no eyewitnesses testified and no physical evidence connected him to the crime. Replacement counsel missed all of that and more, even venturing to another continent during the trial, and prior counsel was under doctor's orders not to return to work. Under those circumstances, no "lawyer, even a fully competent one," *Cronic*, 466 U.S. at 659-60, having missed so much of the live testimony and the consultation with the defendant about the proceedings, would be able "to participate fully and fairly in the adversary factfinding process" on the defendant's behalf. *Herring*, 422 U.S. at 858. Wilson had a right to counsel who "had been there" at all critical stages to carry forward this defense at trial, and with Wicks' incapacitation, the prosecutors obtained a strategic advantage that resulted in an uneven playing field. Under the teachings of *Strickland* and *Cronic*, this was presumptively prejudicial.

Affording Wilson a new trial would undoubtedly have required the investment of additional judicial resources. It is

understandable that, four months into trial, the District Court was loath to declare a mistrial, sever Wilson from his co-defendants, and schedule a new trial against him at the conclusion of the main event. But that is what the Sixth Amendment and due process required. Because this constitutional violation requires reversal, I would not reach the other crimes evidence and *Brady* issues.

Accordingly, I dissent.